## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

In Re:
**SYED AFTAB KAZMI**                          **Chapter 11**

            Debtor            **Case #: 13-10897-BFK**

SYED AFTAB KAZMI
            Plaintiff

v.
Green Point Mortgage Funding Inc          **Adversary No.** _____
EMC Mortgage Corporation
JPMorgan Chase                            **TRIAL BY JURY REQUESTED**
Bear Stearns Asset Backed
Securities I LLC
BEAR, STEARNS & CO. INC
Bear Stearns Capital Markets Inc
Green Point Mortgage Funding
Trust 2006-AR1
GSR Trust 2005-HEL-1
Wells Fargo Bank NA
Equity Trustee LLC
BARCLAYS BANK PLC
BARCLAYS CAPITAL REAL ESTATE, INC
Lender Processing Services, Inc
LPS Default Solutions Inc
DOCX, LLC
MERSCORP Holdings, Inc, Mortgage
Electronic Registration System Inc
("MERS 1, MERS 2, MERS 3")
Bank of America NA
Deutsche Bank National Trust Company
BWW Law Group, LLC
DOES 1 through 50 et al

            Defendants et al

---

## COMPLAINT

1. Plaintiff, SYED AFTAB KAZMI, (hereinafter "Plaintiff") files his complaint against

the Defendants, Green Point Mortgage Funding Inc. (hereinafter "Green"), EMC

Mortgage Corporation, (hereinafter "EMC"), JPMorgan Chase , (hereinafter "JPM")

Bear Stearns Asset Backed Securities I LLC, (hereinafter, "BSABS"), Green Point

Mortgage Funding Trust 2006-AR1, (hereinafter "MBS TRUST"), GSR Trust 2005-

HEL1(hereinafter Second Trust) Wells Fargo Bank NA, (hereinafter "Wells"), Equity

Trustee LLC (hereinafter "Equity"), BARCLAYS BANK PLC, (hereinafter "Barclays

PLC"), BARCLAYS CAPITAL REAL ESTATE, INC, (hereinafter "Barclays Real

Estate"), Lender Processing Services, Inc. (hereinafter "LPS"), LPS Default Solutions

Inc, (hereinafter LPS DSI"), DOCX, LLC, (hereinafter " DOCX"), MERSCORP

Holdings, Inc, Mortgage Electronic Registration System Inc ("MERS 1, MERS 2,

MERS 3"), (hereinafter MERS All"), Bank of America, Deutsche Bank National

Trust Company , BWW, Law Group LLC and DOES 1 through 50 et al,

("collectively Defendants"), hereby represents  and states as follows:

2. This adversary proceeding is one arising in the debtor's case under Chapter 11 of

Title 11.  This is an adversary proceeding pursuant to Bankruptcy Rule 7001.

## JURISDICTION

3. This Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. Sec.

157(a)(b)(1), (b)(2)(1) (core proceeding), 1334 (b) and 11  U.S.C. 523 (c).

4. This adversary proceeding is a "core" proceeding to be heard and determined by the

Bankruptcy Court pursuant to 28 U.S.C. § 157(b)(2).

## VENUE

5. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1409 in

that this proceeding arises in and relates to a bankruptcy case pending in the district

and the claims alleged herein arose in this district.

## BACKGROUND

6. On February27, 2013  (the "Petition Date") the Debtor filed a voluntary petition for

relief under chapter 11 of title 11 of the United States Code, in the United States Bankruptcy Court for the Eastern District of Virginia ("Court").[Docket Entry # 1 dated February 27, 2013]

7. Meeting of Creditors, 341 meeting is scheduled on April 5, 2013 at 10:00AM in US Trustee's office. [ Docket Entry # 15 dated March 13, 2013]

## PARTIES

8. Plaintiff, SYED AFTAB KAZMI, is are the legal record titleholders of their home, pursuant to a grant deed to the property duly recorded in the Loudoun County Recorder's Office, and commonly known as, residents of 43007 Janneys Corner Court Ashburn Virginia 20148.

9. Defendant. Green Point Mortgage Funding Inc, (hereinafter "Green") is a foreign business entity, with its principal place of business, at 100 Wood Hollow Dr. Novato, CA 94945

10. Defendant, EMC Mortgage Corporation, (hereinafter "EMC"), is Delaware corporation with its principal place of business in 909 Hidden Ridge Drive, Suite 200, Irving, Texas 75038.

11. Defendant JPMorgan Chase, (hereinafter JPM") is Delaware corporation with its principal place of business in 277 Park Ave. New York. NY 10172

12. Defendant, Bear Stearns Asset Backed Securities I LLC, (hereinafter, "BSABS"), a Delaware corporation, with its principal place of business in 383 Madison Avenue, New York, New York 10179 . Defendant BSABS served as the depositor and issuer for the Green Point Mortgage Funding Trust 2006-AR1, (hereinafter "MBS TRUST"), a dissolved entity now.

13. Defendant Bear Stearns Capital Markets Inc., a Delaware corporation and an affiliate of the sponsor, the Defendant, Bear Stearns Asset Backed Securities I LLC and the Bear Stearns & Co, entered into two swap agreements with the now terminated

3

trustee, Defendant Wells Fargo, with its principal place of business at, 383 Madison

Avenue, New York, New York 10179

14. Defendant, Green Point Mortgage Funding Trust 2006-AR1, (hereinafter "MBS

TRUST") is a DISSOLVED TRUST since 2008, was created under the New York

Trust Law, and was dissolved in 2008 due to major trigger event when AIG was

bailed out and toxic assets were sold to Maiden Lane I, II, III LLC under the

supervision of Federal Reserve Bank of New York and US Treasury as per Assets

Purchase Agreement of December 2008.

15. Defendant, GSR Trust 2005-HEL-1, (hereinafter "Second TRUST") is a

DISSOLVED TRUST since 2008, was created under the New York Trust Law, and

was dissolved in 2008 due to major trigger event when AIG was bailed out and toxic

assets were sold to Maiden Lane I, II, III LLC under the supervision of Federal

Reserve Bank of New York and US Treasury as per Assets Purchase Agreement of

December 2008.

16. Defendant, Wells Fargo Bank NA, (hereinafter "Wells") was the trustee (a generic

term for an entity not incorporated or registered to do business in any of the United

States in order to facilitate illegal property foreclosures), with its principal place of

business at 9062 Old Annapolis Road, Columbia, Maryland 21045-1951. Defendant

Wells Fargo is not the Trustee of MBS Trust, "Green Point Mortgage Funding Trust

2006-AR1, because the MBS Trust was dissolved in 2008.

17. Defendant, Equity Trustee LLC (hereinafter "Equity"),is a foreign corporation,

incorporated in Maryland, with its principal place of business, 2020, 14th Street N #

250 Arlington, VA 22201-2517, conducts business of illegal foreclosure in violation

of Virginia Code Section 55-58.1 (2)

18. Defendant, BARCLAYS BANK PLC, (hereinafter "Barclays PLC"), is a foreign

corporation has its principal place of business in, United Kingdom and 745 Seventh

4

Avenue, New York, NY 10019, USA in New York, and regularly conducts business

in the State of Virginia and not registered to do business in Virginia.

19. Defendant, BARCLAYS CAPITAL REAL ESTATE, INC. has its principal place of

business at 200 Park Ave New York, NY 10166, and regularly conducts business in

the State of Virginia, when not registered to do business in Virginia.

20. Defendant Lender Processing Services, Inc. ("LPS") is a Delaware Corporation, with

its principal place of business in Jacksonville, Florida, and is not registered to engage

in business in the state of Virginia.

21. Defendant DOCX LLC,( hereinafter "DOCX".)   Defendant, DOCX, is a Georgia

Corporation with its principal place of business in Irvine, California.  Although

DOCX is doing business in the state of Virginia, it is not registered to engage in

business in the state of Virginia

22.  Defendant, LPS Default Solutions Inc, (hereinafter LPS DSI"), is a Delaware

Corporation, with its principal place of business in Jacksonville, Florida, and is not

registered to engage in business in the state of Virginia.

23. Defendant  Mortgage Electronic Registration System Inc, MERS1, MERS2 and

MERS3 ( hereinafter collectively " ALL MERS"), is a owned by the company,

MERSCORP,  is a Delaware Corporation, with its principal place of business in

1818 Library Street # 300 Reston, VA 20190-6280.  Defendant MERS has three

names as MERS-1, MERS-2 and MERS-3, all having same place of business.

24. Defendant Bank of America, is a foreign business entity, with its principal place of

business, at PO Box 5170 Simi Valley CA 93062.

25. Defendant Deutsche Bank National Trust Company, was the trustee (a generic term

for an entity not incorporated or registered to do business in any of the United States

in order to facilitate illegal property foreclosures), with its principal place of business

at 1761 East St. Andrew Place, Santa Ana, California 92705-4934 Defendant

5

Deutsche Bank National Trust Company is not the Trustee of Trust, " GSR Trust

2005-HEL1, because the Trust was dissolved in 2008.

26. Defendant BWW Law Group LLC, (hereinafter "BWW"), is a professional

corporation, with its principal place of business, 4520 East West Highway Suite 200

Bethesda Maryland 20814. Defendant BWW Law Group LLC is involved in creation

of illegal documents through Defendant LPS, Docx.

27. Defendants DOES 1 through 50 et al., are unknown to Plaintiff and their exact name

will be listed as and when information about them is received.

## NATURE OF ACTION

28. This is an action for rescission of an illegal and void (mortgage loan transaction )

Deed of Trust and Note to certain real estate, for violation of TILA.

29. This action is also against various defendants who were involved in the causing of

the USD LIBOR to be manipulated by knowingly and intentionally submitting false

data to British Banking Association, "BBA".

30. Defendants' collective association, including through their participation together as

members of the BBA's USD LIBOR panel, constitutes the RICO enterprise in this

action.

31. Every member of the enterprise participated in the process of misrepresenting their

costs of borrowing to the BBA.

32. Using those false quotes to cause the BBA to set USD LIBOR artificially low

constitutes the common purpose of the enterprise.

33. Defendants caused the USD LIBOR to be manipulated by knowingly and

intentionally submitting false data to BBA

34. Defendants had two reasons to falsify their submissions. **First**, the Contributing

Panel banks did not want to signal their own distress by admitting publicly that their

peers were reluctant to lend to them except at elevated rates. **Second**, due to their

6

own net interest rate exposure, at least some of the Contributing Panel banks stood to

reap large financial benefits from even a modest decrease in USD LIBOR.

35. Defendants had a motive to, and did in fact, falsify the rates that they submitted to

give the appearance that their funding costs were lower than they actually were, and

to give the appearance that Defendants remained strong despite the deteriorating

economic environment.

36. Defendants had a substantial economic incentive to try to push the aggregate reported

USD LIBOR rate lower

37. This purported mortgage and note and the actions taken by Defendants contain unfair

trade practices and predatory lending practices.

38. On August 25, 2012,  Plaintiff and his wife  rescinded this transaction, which was

received by Defendants EMC, JPM and Wells.  Defendants ignored Rescission,

committed another violation of TILA. **EXHIBIT-A**

39. Plaintiff was not in default, was paying his mortgage payments regularly and his

payments were not being credited towards his mortgage account, because the MBS

Trust, Green Point Mortgage Funding Trust 2006-AR1, was dissolved in 2008, and

duties of Wells Fargo as Trustee were terminated.

40. Plaintiff and his wife were served two illegal foreclosures from Defendants, EMC,

JPM and Wells et al, through the manufactured defaults, when Plaintiff was not in

default.

### Rescission as a Defense to Foreclosure

41. Plaintiff and his wife  were not in default and their Mortgage Payments were not

credited towards their account, because the Pool Trust MBS Trust, Green Point

Mortgage Funding Trust 2006-AR1was dissolved in 2008. Defendants, EMC, JPM

and Wells et al twice attempted to foreclose the Plaintiff's Primary residence through

the manufactured defaults just to cash Credit Default Swaps and Insurance Policies

7

on Plaintiff's loan. Plaintiff rescinded the loan transaction as a defense to

foreclosure on August 25, 2012. **EXHIBIT-A**

**Rescission by Recoupment After Three-Year Period. 15 U.S.C. § 1635(i)(3)**

42. Plaintiff and his wife rescinded the loan transaction, rescission by Recoupment After

    Three-Year Period. 15 U.S.C. § 1635(i)(3) and Pursuant to new TILA (Reg Z),

    which is law now, 15 U.S.C. 1641 – specifically section 131(g)  [ Bankruptcy Court

    Docket Entry #18 entered on March 13, 2013] **EXHIBIT-A**

43. Pursuant to new TILA (Reg Z), which is law now, 15 U.S.C. 1641 – specifically

    section 131(g), Defendants were required to notify the borrowers, Syed Aftab Kazmi

    and Afshan Kazmi, in this case in writing within 30 days after their mortgage loan is

    sold or otherwise transferred. The notice must include:

    a) The assignee's identity, address and phone number;
    b) The date of transfer;
    c) *Contact information for an agent or party having authority to act on behalf
       of the assignee;*
    d) The location of the place where transfer of ownership of the debt is
       recorded; and
    e) Any other relevant information regarding the assignee.

35. Defendants have failed to notify as required pursuant to 15 U.S.C. § 1635(i)(3) and

    Pursuant to TILA (Reg Z) 15 U.S.C. 1641 – specifically section 131(g) as per time

    required.

36. The notice must be given even where the new and former owners are affiliates, but

    a combined notice may be sent where one company acquires a loan and subsequently

    transfers it to another company so long as the content and timing requirements are

    satisfied as to both entities.

37. The required information also includes a disclosure of the location where ownership

    of the debt is recorded. If a transfer has not been recorded in the public records at the

time the notice is provided, a new owner may satisfy this requirement by stating that

fact.

38. Plaintiff never received any such notice from the parties involved in the sale of loan

who are in violation of TILA continuously.

39. Plaintiff, is informed and believe, and allege thereon, that each of the parties

unknown to Plaintiff failed to sent the notice with information to Plaintiff, pursuant

to TILA (Reg Z) 15 U.S.C. 1641 – specifically section 131(g) and is responsible in

some manner for the violation

40. Thus, assignees are not exempt from the duty to provide notice merely because the

mortgage (as opposed to the note) is in the name of Defendant Mortgage Electronic

Registration Systems (MERS), when Defendant MERS is not creditor and MERS

name is not there on the Promissory Note.

41. Plaintiff, is informed and believe, and allege thereon, that an assignee that violates

this notice requirement will be subject to civil penalties under Section 130(a) of

TILA. 15 USC § 1640(a).

42. The transfer notice requirement applies to all closed-end and open-end consumer-

purpose mortgage loans secured by a consumer's principal residence. It requires any

person that acquires more than one mortgage loan in any 12-month period to provide

a transfer notice without regard to whether the new owner would otherwise be a

"creditor" subject to TILA.

43. Defendants were informed by Plaintiff that if Defendants will not follow the second

step of rescission within 20 days, by cancelling the security or filing a declaratory

action to challenge our rescission in court, (Official Staff Commentary §§ 226.15 (d)

(2) -3, 226.23 (d) (2) -3.), then by operation of law the security interest and

promissory note automatically becomes void and the consumer is relieved of any

9

obligation to pay any finance or other charges (15 USC-1635(b); Reg. Z-226.15(d)
(1),226.23(d)(1). See Official Staff Commentary § 226.23(d)(2)-1

44. Plaintiff also seeks recovery for damages for non-disclosure of Plaintiff's right to
cancel, non-disclosure of certain Truth in Lending disclosures and Federal violations
of numerous consumer rights stated below;

## BACKGROUND

44. Plaintiff, SYED AFTAB KAZMI and his wife Mrs. Afshan Kazmi, are the
rightful owner of the Property and their family live in this home.

45. Plaintiff signed Promissory Note, (Note) and Deed of Trust (DOT) on October 11,
2005. **EXHIBIT-B & C**

46. These illegal foreclosure sale attempts by Defendants EMC, JPM and Wells et al,
followed a series of miscues and shoddy documentation by the Defendants and is
endemic of the kind of recent controversy over the irregularities and legitimacy of
the foreclosure process including but not limited to the practice of *"robo-signing"*
(document processors who signed off on thousands of foreclosures each week
without reviewing the files).

47. Plaintiff, is informed and believe, and allege thereon, that, this controversy, which
came to light after evidence of deeply flawed foreclosure practices were revealed
and lawsuits and media reports showed that lenders such as the Defendant were
routinely filing shoddy or fraudulent papers to seize the homes of borrowers such as
Plaintiff in this case, and has prompted a congressional oversight panel to look into
the *"mortgage mess."* In one hearing the Federal Deposit Insurance Corp. Chairman
Sheila Bair stated;

> *"it is vitally important that the modification process be brought to
> conclusion before a foreclosure sale is scheduled...and failure to
> coordinate the foreclosure process with the modification process risks
> confusing and frustrating homeowners and could result in unnecessary
> foreclosures."* (Senate Hearing, December, 2010).

48. At about the same time that this was taking place the United States Senate

was also complaining that lenders such as the Defendants;

> *"were not doing enough to help homeowners avoid foreclosure and*
> *that some borrowers who qualify for federal aid were still losing their*
> *homes."* (Washington Post Business, April 30, 2010).

49. Sen. Ted Kaufman (D. Del.), who heads the senate panel investigating the

widespread problem of flawed and fraudulent foreclosure paperwork also

noted that;

> *"...distressed borrowers are entitled to due process, especially*
> *when banks are trying to take their homes."(US Senate*
> *Hearing, November 2010).*

50. That the Defendants along with others are being challenged all over the US to

appear in court and explain why foreclosures should not be suspended because of

the numerous irregularities is not surprising, because of the damage that it has done

to homeowners, Plaintiff in this case.

51. In Virginia, a state that is known for strict adherence with the law, government

regulators and officials are coordinating foreclosure investigations to look into the

very practices that Plaintiff is now complaining about.

52. On  December 21, 2010, the Washington Post has stated that banks such as the

Defendants were chosen *"based on the public record of questionable practice. "*

(Washington Post, Zachary A. Goldfarb, December 21, 2010).

53. Plaintiff was not in default but the Defendants attempted to illegally foreclose on

Plaintiff and foreclosure sale was set for September 20, 2012.

54. Plaintiff contacted the Defendants and no one was willing to work, correct their

accountings and cancel the foreclosure sale scheduled.

55. On or about September 20, 2012  Plaintiff, subsequently filed a voluntary case for relief

under Chapter 13 of the United States Bankruptcy Code of 2005 ("the Code") (Case

# 12-15681-BFK).

11

56. Defendant again attempted to foreclose by scheduling the foreclosure sale on March

01, 2013 and none of the Defendants were willing to help and cancel the sale date.

57. On or about February 27, 2013 Plaintiff, subsequently filed a voluntary case for relief

under Chapter 11 of the United States Bankruptcy Code ("the Code") (Case # 13-

10897-BFK).

## COUNT-I

**(DISCLOSURE VIOLATION PURSUANT TO, Section 130(a)- 15 U.S.C. 1640(a). AGAINST JPMorgan Chase, EMC, Wells Fargo(terminated Trustee) and MERS-1, MERS-2, MERS-3 and MERSCORP Inc)**

58. Plaintiff repeats, reaffirms and re-alleges the facts made above in all paragraphs as if

more fully set forth and incorporated by reference herein, below.

59. Plaintiff's loan was sold multi times by the Defendants as unregistered and

unregulated security, in more than one Trust .

60. Pursuant to TILA (Reg Z) 15 U.S.C. 1641 – *specifically section 131(g)*, Defendants

JPMorgan Chase, EMC, Wells Fargo(terminated Trustee) and MERS-1, MERS-2,

MERS-3 and MERSCORP Inc, and were required to notify the borrowers, Plaintiff

in this case in writing within 30 days after his mortgage loan is sold or otherwise

transferred. The notice must include:

    f) The assignee's identity, address and phone number;
    g) The date of transfer;
    h) Contact information for an agent or party having authority to act on behalf of the assignee;
    i) The location of the place where transfer of ownership of the debt is recorded; and
    j) Any other relevant information regarding the assignee.

61. An assignee that violates this notice requirement will be subject to civil penalties

under Section 130(a) of TILA.  15 USC § 1640(a).

62. The transfer notice requirement applies to all closed-end and open-end consumer-

purpose mortgage loans secured by a consumer's principal residence. It requires any

person that acquires more than one mortgage loan in any 12-month period to provide

a transfer notice without regard to whether the new owner would otherwise be a

"creditor" subject to TILA.

63. Thus, assignees are not exempt from the duty to provide notice merely because the

mortgage (as opposed to the note) is in the name of Defendant Mortgage Electronic

Registration Systems (MERS-1, MERS-2, MERS-3 and MERSCORP Inc ), when

Defendant MERS is not creditor and MERS name is not there on the Promissory

Note.

64. The new TILA rule does not affect the separate notification requirement under the

Real Estate Settlement Procedures Act (RESPA) for servicing transfers on mortgage

loans. Accordingly, new owners who acquire both legal title to a mortgage loan and

the servicing rights will need to satisfy both the TILA and RESPA notification

requirements.

65. The notice must be given on or before the 30th calendar date after the date the new

owner acquires the loan, with *the acquisition date deemed to be the date that the*

*acquisition is recognized in the new owner's books and records.*

66. The notice must be given even where the new and former owners are affiliates, but

a combined notice may be sent where one company acquires a loan and subsequently

transfers it to another company so long as the content and timing requirements are

satisfied as to both entities.

67. The notice must contain the information specified by the new rule, including contact

information for any agents used by an owner to receive legal notices and resolve

payment issues.

68. The required information also includes a disclosure of the location where ownership

of the debt is recorded. If a transfer has not been recorded in the public records at the

13

time the notice is provided, a new owner may satisfy this requirement by stating that

fact.

69. Plaintiff never received any such notice from the Defendants who are in violation of

TILA continuously.

70. The MERS system harms homeowners and undermines the public interest by

concealing information that is essential both to the maintenance of accurate public

land and court records, and to individual homeowners, particularly those who seek

redress for predatory mortgages or face foreclosure.

71. **First**, because MERS obfuscates the true owner of the note, MERS creates

significant and detrimental confusion among borrowers and homeowners, their

advocates, and the courts

72. **Second**, MERS frustrates established public policy, which dictates that title

information must be publicly available, thus causing harm to state and local

governments, advocacy groups, and academic researchers who routinely rely on

public database information to inform legislative decision-making, to support law

enforcement, and to advance policy solutions to a wide variety of housing and

mortgage issues.

73. Plaintiff is informed and believes, and alleges thereon, that each defendant failed to

sent the notice with information to Plaintiffs, pursuant to TILA (Reg Z) 15 U.S.C.

1641 – specifically section 131(g) and is responsible in some manner for the

violation alleged in their complaint, and that Plaintiff's damages were proximately

caused by the defendants at all times mentioned in the complaint.

74. Plaintiff is specifically in the class of persons this statute was designed to protect.

75. As a direct, proximate, and foreseeable result of Defendant's actions, Plaintiff is

subject to loss of property and loss of use of property and other damages as a result of

Defendant's violation of (Reg Z) 15 U.S.C. 1641 – specifically section 131(g).

14

76. Defendants, did not follow the second step of rescission within 20 days, by cancelling the security or filing a declaratory action to challenge our rescission in court, (Official Staff Commentary §§ 226.15 (d) (2) -3, 226.23 (d) (2) -3.), then by operation of law the security interest and promissory note automatically becomes void and the consumer is relieved of any obligation to pay any finance or other charges (15 USC 1635(b); Reg. Z-226.15(d) (1),226.23(d)(1). See Official Staff Commentary § 226.23(d)(2)-1

77. Defendants failed to file the a declaratory action to challenge Plaintiff's rescission in court, (Official Staff Commentary §§ 226.15 (d) (2) -3, 226.23 (d) (2) -3.), then by operation of law the security interest and promissory note automatically becomes void and the consumer is relieved of any obligation to pay any finance or other charges (15 USC 1635(b); Reg. Z-226.15(d) (1),226.23(d)(1). See Official Staff Commentary § 226.23(d)(2)-1

78. Defendants status was reduced from secured creditors to unsecured, and unsecured creditors are unable to foreclose.

79. Plaintiff requests this court to enter a Judgment against the Defendants and all of the assignees for violating and ignoring the Well-settled law and TILA, as under;

   A.  To Order Defendants to file Termination of the Security Interest and Plaintiff's liability

   B.  To Order Defendants to return to the Plaintiffs any amount of money or property that has been given to anyone in connection with the transaction

   C.  To Order Defendants to take affirmative steps to reflect the fact that the security interest was automatically terminated by the rescission.

   D.  To Order Defendants to refund finance charges already accrued, closing costs, credit insurance premiums, and security interest charges must be refunded.

E.  To Order Defendants to refund costs given to third parties, and need not

represent profit to the creditor, application fees, membership fees, commitment

fees, appraisal fees, survey fees, title search fees, broker fees, credit report fees,

filing fees, document preparation fees, attorney fees, and credit insurance

premiums, whether paid to the creditor, paid by the consumer directly to a third

party, or passed on from the creditor to a third party, must be refunded.  See also

In re Wright, 133 B.R. 704 (E.D. Pa. 1991); Official Staff Commentary §§

226.15(d)(2)-1, 226.23(d)(2)-1.

F.  To Order Defendants, to refund all payments received from the Plaintiff from

2006 till present.

G.  To Award statutory damages, actual damages for which the creditor is liable for

filing wrongful foreclosure twice, when Plaintiffs not in default, ignoring the

rescission and committing repeated violations of the TILA and other Federal and

State Laws.

H.  To Award statutory damages, actual damages for violations of TILA

I.  To Award statutory damages, actual damages, State Law Damages for violations

of substantive consumer protections, such as a state usury  or state unfair and

deceptive practices law.

J.  To Award Attorney fees pursuant to 1640 taken as a whole that Congress

intended the remedies of section 1640(a) to apply to any creditor or assignee who

violates TILA.

K.  Any other remedy, which deems fit and proper.

## COUNT -II
## (VIOLATION FAILURE TO DISCLOSE INTEREST RATE PURSUANT TO REGULATION Z, PART 226.4, AGAINST ALL DEFENDANTS )

72. Plaintiff repeats, reaffirms and re-alleges the facts made above in all paragraphs as if

more fully set forth and incorporated by reference herein, below.

73. USD LIBOR (London Interbank Offered Rate, or LIBOR) is the most important benchmark that lending institutions throughout the country, use to set interest rates for floating rate loans.

74. Defendants were on the panel from which USD LIBOR rates were set, and provided false information on their own borrowing costs which was incorporated into USD LIBOR rates, having the effect of artificially lowering such rates.

75. Defendants when they were members of the Contributing Panel, stood to reap large financial benefits from even a modest decrease in USD LIBOR, at the cost of the Plaintiffs and others.

76. The USD LIBOR is the result of a calculation based upon submissions from a panel bank for the currency selected by the , British Banking Association, "BBA".

77. No regulatory agency oversees the setting of LIBOR by the BBA and its members, the integrity of LIBOR relies entirely upon the honesty of the Contributing Panel.

78. There is anecdotal evidence that Contributing Panel banks submitted false reports to BBA in order to benefit the derivatives traders at their respective.

79. Defendants Barclays, Wells Fargo, JPMorgan Chase et al and other financial institutions and their agents/employees were manipulating the LIBOR rate, fixing the rate higher or lower at various times from 2005 through 2009.

80. Plaintiff's did a closing on October 11, 2005 for First and Second Trust, when Defendants et al caused the USD LIBOR to be manipulated by knowingly and intentionally submitting false data to "BBA", when Defendants were the Contributing Panel members of BBA.

81. Defendants had a substantial economic incentive to try  to push the aggregate reported USD LIBOR rate.

82. Therefore, Defendants had a motive to, and did in fact, falsify the rates that they submitted to give the appearance about their funding  costs , than they actually were.

83. London Interbank Offered Rate, "LIBOR" is an acronym for London Interbank

Offered Rate and is;

    a. "intended to be a barometer to measure strain in money markets, that it often is a gauge of the market's expectation of future central bank interest rates, and that approximately $350 trillion of notional swaps and $10 trillion of loan are indexed to LIBOR."

84. Unbeknownst to Plaintiff, Barclays and other third party financial institutions,

including staff from Defendants et al, were manipulating the LIBOR rate from 2005

through 2009.

85. Defendants, et al and other non-defendants manipulated the LIBOR rate.

86. Traditionally, certain agreements have been "conclusively presumed to be

unreasonable and therefore illegal without elaborate inquiry as to the precise harm

they have caused or the business excuse for their use" because of "their pernicious

effect on competition and lack of any redeeming virtue." *Northern Pacific Ry. v. U.S.,*

356 US 1, 5 (1958).

87. Such agreements are considered illegal, per se. *U.S. v Socony-Vacuum Oil Co. Inc.,*

310 US 150 (1940).

88. With the manipulation of the LIBOR rate, today's rates could have been yesterday's

rates or happened much quicker without lag, as there is no way of proving that the

interest rate would not have plummeted or escalated during the financial crisis or just

preceding it.

89. Barclays and Defendant Wells and JPMorgan Chase have entered into several

agreements with various government agencies admitting that Barclays, and other

financial institutions and their agents/employees were manipulating the LIBOR rate,

fixing the rate higher or lower at various times from 2005 through 2009.

90. UBS, Barclays, Defendants et al   and Deutsche Bank are among 20 major financial

institutions, under investigation for colluding to manipulate the bench mark rate

18

91. According to Appendix A to the Non-Prosecution Agreement, dated June 26, 2010

between the United States Department of Justice Criminal Division, Fraud Section,

and Barclay's Bank PLC, at the same time Plaintiff was making their payments a

*multitude of messages were being sent to manipulate the LIBOR rate as follows:*

    a  "For Monday we are very long 3m cash here in NY and would like the setting to be set as low
    as possible…thanks" (December 14, 2006, Trader in New York to Submitter)."

98. So while Plaintiff was stuck paying   6.00 % adjustable  interest on their loan, which

was tied with the LIBOR, and Defendants et al were making a positive cash flow.

99. The Libor rate on October 11, 2005, when Plaintiff obtained   loan  was ; One

Month-3.941,  3Months-4.130,  6 Months- 4.310 and 12 Months-4.520

100.    The one-month LIBOR rate currently sits at 0.20, three-Month sits at 0.28 and

six-month sits at 0.45 percent as of March 27 of 2013.

101.    The LIBOR submitters including Defendants et al regularly considered the swaps

traders' requests when determining and making Barclays' US Dollar LIBOR

submissions.

102.    On June 27, 2012 a press release from the U.S. Dept. of Justice announced

"Barclays Bank PLC Admits Misconduct Related to Submissions for the London

Interbank Offered Rate and the Euro Interbank Offered Rate and Agrees to Pay $160

Million Penalty."

103.    On July 31, 2012 Deutsche Bank,  admitted about LIBOR, habitual, fraudulent,

global  Rigging Scandal, which is a series of fraudulent actions connected to

the Libor.

104.    Defendants have  already said it has set aside money to cover any litigation costs

over rate-rigging. U.S., U.K. and other Banking regulators have been investigating

allegations that more than a dozen banks, including Deutsche Bank, have rigged

Libor, and other interest rates underpinning trillions of dollars in loans and other

financial contracts.

105.    The scandal arose when it was discovered that banks including Defendants et al were falsely inflating or deflating their rates so as to profit from trades, or to give the impression that they were more creditworthy than they were. Libor underpins approximately $350 trillion in derivatives. Deutsche Bank made a profit of at least 500 million euros ($654 million) on trades in 2008 tied to the London interbank offered rate, or Libor, and other global benchmark rates, The Wall Street Journal (Journal) reported, citing internal bank documents.

106.    Regulators have been probing allegations that more than a dozen banks, including Deutsche Bank, manipulated Libor and other rates. The investigation has resulted in settlements totaling nearly $2 billion with Barclays PLC and UBS AG.

107.    The Deutsche Bank documents were handed to investigators by a former bank employees , the Journal said. The former employee told regulators some employees expressed concerns about the risks surrounding the bets, but that bank officials dismissed the worries because the bank could influence the rates.

108.    Deutsche Bank benefited from trades pegged to the London Interbank Offer Rate (Libor) currently under investigation, the Wall Street Journal reported, in profit from the trades, manipulation of the LIBOR.

109.    Borrowers Plaintiff in this case relied upon trust that was breached, money that was invented, figures that were fabricated, lying, cheating and inside trading to the detriment of the institutions including the Defendants et al , that participated in one form or another.

110.    The ultimate victims on both sides of the transaction is the consumers including the Plaintiffs.

111.    The manipulation of LIBOR rates resulted in the wrong calculation of adjustable rate mortgages (including the Plaintiff's loan), making the notices of default, demand for payment and perhaps even the sales illegal.

20

112. The insertion of nominees controlled by the investment banks as payees, nominees, trustees, beneficiaries and mortgagees in lieu of the institutions that were actually providing the money and hiding the compensation that TILA requires to be disclosed, the steady practice of table funded loans which are deemed "predatory per se" under regulation Z, allowed intermediaries to pretend to be the lenders, the owners of the loans so they could trade with impunity.

113. To be certain the manipulation of the LIBOR rates was clearly an intentional act, but so was the insertion of the bankers naked nominees, when Plaintiff's residential loans were originated.

114. Defendants et al manipulated rates by creating second tier yield spread premiums, and thus created spreads upon which they could withdraw money, pay for insurance, credit default swaps and other bets that the bad loans they wanted and received would fail, leaving the market in free-fall.

115. LIBOR scandal is being couched in terms where the Defendants et al were conspiring but the Plaintiffs were unaware of their transgressions.

116. Libor, is considered to be one of the most crucial interest rates in finance. It underpins trillions of dollars worth of loans and financial contracts.

117. Defendants et al manipulated Libor submissions to give a healthier picture of the bank's credit quality and its ability to raise funds.

118. The banks including Deutsche Bank already admit criminal wrongdoing in setting LIBOR, the foundation for computation of all interest rates.

119. Thus the homeowner, Plaintiff in this case additionally DENIES the amount due and demands DISCOVERY of the calculations that were made and by whom those calculations were made when the loan was approved and/or when the monthly statement went out and/or when the monthly payment was supposedly adjusted to reflect LIBOR or changes based upon LIBOR.

21

120.    Defendants, besides corrupting the title registries across the state, conspired to wreck the economy of the state by false calculations in which the Defendants themselves were the source of the LIBOR manipulations, Libor rigging, Libor Fraud and market manipulations.

121.    Consumers including Plaintiff in this case have been slammed with most of their wealth siphoned off by Defendants who were acting intentionally to screw the people who rely on those pension funds.

122.    The average home loan in the United States is a loan expected to be paid back over a thirty year (30) term, and Plaintiff's home loan was originally supposed to be paid back over 30 year term.

123.    Defendants failed to disclose beginning interest rates, which was manipulated with the LIOBR and the adjustable rate rider.

124.    Plaintiff is specifically in the class of persons this statute was designed to protect.

125.    As a direct, proximate, and foreseeable result of Defendant's failure to provide proper notice, Plaintiffs are subject to loss of property and loss of use of property and other damages as a result of Defendant's failure

### COUNT -III
### Violation of the Sherman Antitrust Act §1 (Price Fixing)
### (Against ALL DEFENDANTS)

126.    Plaintiff repeats, reaffirms and re-alleges the facts made above in all paragraphs as if more fully set forth and incorporated by reference herein, below.

127.    Plaintiff suffered damages as a result of Defendants , Bank of America, JPMorgan Chase, Wells Fargo and Deutsche Bank et al's fraudulent conduct in artificially decreasing the USD LIBOR rate during 2005-2009.

128.    As a result, a misrepresentation in the referenced USD LIBOR rate on the date on which a loan resets will generally reduce the amount of interest that a lender receives by an equivalent amount.

22

129.    Defendants, who were each Contributor Panel banks  for the USD LIBOR panel, knew and understood that it was common practice during the 2005-2009 for banks throughout the United States, to issue floating-rate loans tied to USD LIBOR rates. Accordingly, it was not only foreseeable but obvious that by manipulating the rate of USD LIBOR, Defendants would impair the interest income providing USD LIBOR-tied loans.

130.    Despite knowing that manipulating USD LIBOR could profoundly impact vast quantities of financial transactions, Defendants repeatedly made intentionally false representations about their borrowing costs to the BBA, resulting in the artificial suppression of USD LIBOR rates during 2005-2009, and causing significant damages to Plaintiff.

131.    Defendants, participated in submitting index borrowing rates that became part of the LIBOR rate.

132.    The misconduct exposed the willingness of Defendants to lie on  USD LIBOR submissions, and their success and profits from these deceptive practices emboldened them to make the far more significant misrepresentations that injured Plaintiff.

133.    Defendants caused the USD LIBOR to be manipulated by knowingly and intentionally submitting false data to BBA.

134.    Defendants had two reasons to falsify their submissions. **First**, the Contributing Panel banks did not want to signal their own distress by admitting publicly that their peers were reluctant to lend to them except at elevated rates. **Second**, due to their own net interest rate exposure, at least some of the Contributing Panel banks including Defendants et al stood to reap large financial benefits from even a modest decrease in USD LIBOR.

135.    During the 2005-1009 and till present, Defendants were and are still on the panel from which USD LIBOR rates were set, and provided false information on their own

borrowing costs which was incorporated into USD LIBOR rates, having the effect of artificially lowering such rates.

136.   The USD LIBOR is the result of a calculation based upon submissions from a panel bank for the currency selected by the BBA.

137.   No regulatory agency oversees the setting of LIBOR by the BBA and its members, the integrity of LIBOR relies entirely upon the honesty of the Contributing Panel, there is anecdotal evidence that Contributing Panel banks submitted false reports to BBA in order to benefit the derivatives traders at their respective banks.

138.   Defendant's manipulation of LIBOR was aimed at maximizing the trader's position at specific points of time and these traders were the employees of the Defendants.

139.   Defendants caused the USD LIBOR to be manipulated by knowingly and intentionally submitting false data to BBA, which did not honestly reflect the Defendant's actual borrowing cost on the interbank market.

140.   Defendants had a motive to, and did, in fact, falsify the rates that they submitted to give the appearance that their funding costs were lower than they actually were. Defendants had a substantial economic incentive to try to push the aggregate reported USD LIBOR rate. Defendants therefore had both reputational and financial motive to manipulate USD LIBOR.

141.   On April 12, 2008, the New York Fed Federal Reserve Bank of New York noted in an internal report that the USD LIBOR, a rate reflecting the representations of the Contributing Panel banks rather than actual transacted rates, was significantly lower than the rates the Defendants bid to access USD funds from FR Term Auction Facility ("TAF"), a true auction for actual funding, this raised question over the accuracy of Deutsche Bank's LIBOR fixing rate.

24

142.    The divergence between the actual transactions they were willing to pay to access

TAF funds and the reported USD LIBOR rates reached as much as 30 basis points by

April 2008.

143.    In August and early December 2007, NY Fed acknowledged that Deutsche Bank,

JPMorgan Chase, Wells Fargo and Bank of America et al and other Panel members

false reporting to BBA the divergence was caused.

144.    May 6, 2008 presentation by NY Fed to US Treasury that Defendants et al

actually misquoted the LIBOR for economic incentive to avoid signaling funding

changes, and they knew that dishonesty was likely to be exposed.

145.    Beginning as early as January 1, 2005, despite knowing that manipulating

LIBOR could profoundly impact vast quantities of financial transactions, Defendants

together and in concert repeatedly made intentionally false representations about

their borrowing costs to the BBA, and causing significant damages to Plaintiffs and

others who purchased and/or held properties such LIBOR-based instruments issued

by market participants .

146.    Thus, by suppressing LIBOR, Defendants caused artificially low interest rates to

attach to fixed-rate and variable rate notes and other LIBOR-based financial

instruments sold by issuers and market participants other than Defendants, depriving

Plaintiff and the consumers of substantial sums of money.

147.    In June 2012, the first admissions of Defendants deliberate and coordinated

efforts to suppress LIBOR began to come to light, when Defendant Barclays

announced that it had agreed to pay $450 million to resolve investigations in the

United States and the United Kingdom.

148.    As part of its settlement, Barclays admitted to a detailed "Statement of Facts"

("Barclays SOF") citing scores of internal emails, as well as communications with

25

other LIBOR panel banks including Defendants et al. in furtherance of their

agreement to manipulate and suppress the published LIBOR rates.

149.    Barclays itself has admitted that it conspired with other panel banks including

Defendants Deutsche Bank , JPMorgan Chase, Wells Fargo and Bank of America et

al to manipulate USD LIBOR.  Barclays  SOF ¶23. Dude, I owe you big time!  Come

over one day after work and I'm opening up a bottle of Bollinger!  Thanks for the

libor."  Barclays SOF ¶26

150.    Bloomberg's December 13, 2012 article entitled "Libor Transcripts Expose Rate-

Rigging With Police Nearby" also recites transcripts of instant messages and

telephone conversations among Defendant traders agreeing to rig the LIBOR rate.

### Defendants Manipulated LIBOR To Reap Enormous Profits

151.    Defendants had a substantial economic incentive to suppress the aggregate

reported USD LIBOR rate because financial instruments issued by Defendants and

other transactions involving Defendants included payment obligations linked to

USD LIBOR.

152.    By agreeing to artificially suppress LIBOR, Defendants enabled each other to

reap enormous profits by avoiding paying counterparties the higher amounts they

otherwise would have been obligated to pay absent Defendants' unlawful conduct.

153.    Defendants' motive to manipulate LIBOR submissions in order to reap enormous

profits is further confirmed by the FSA's findings in connection with UBS's $1.5

billion settlement.

154.    Additionally, derivatives traders and brokers were encouraged to – and richly

rewarded for – engaging in the scheme to rig LIBOR rates by Defendants Deutsche

Bank et al.

### Defendants Manipulated LIBOR To Avoid Media Scrutiny Of Their Financial Condition

26

155.    Defendants were also motivated to manipulate LIBOR to avoid negative
publicity, particularly during the financial crisis that emerged in 2007.

156.    Defendants had a motive to, and did, in fact, falsify the rates that they submitted
to give the appearance that their funding costs than they actually were, and to give the
appearance that Defendants remained strong despite the deteriorating economic
environment.

### The Wrongful Acts Of The Conspiracy

157.    Defendants' conspiracy was by its nature self-concealing.

158.    Accordingly, Plaintiff believes that additional substantial evidence supporting the
allegations of Defendants' conspiracy will be developed through discovery.

159.    Nonetheless, significant information has recently become publicly available that
confirms the coordinated and collusive manipulation of USD LIBOR by Defendants
Deutsche Bank, JPMorgan Chase, Wells Fargo and Bank of America et al.

### Government Investigations, Criminal And Civil Enforcement Proceedings, And SEC Filings Further Support Defendants' Conspiracy To Manipulate LIBOR

160.    Beginning in early 2011, Defendants first began disclosing the existence of
government investigations into possible LIBOR manipulation.

161.    On March 15, 2011, UBS revealed in its annual report on Form 20-F filed with
the SEC that the bank had "received subpoenas" from the SEC, the CFTC, and the
U.S. DOJ "in connection with investigations regarding submissions to the [BBA]"
and that these investigations.

162.    Similarly, in March 2011, various news agencies reported that UBS, Bank of
America, JPMorgan Chase, Wells Fargo, Citigroup and Barclays and Deutsche Bank
also had received subpoenas from United States regulators regarding the potential
manipulation of USD LIBOR.

27

163.   March 16, 2011 Financial Times article specified that investigators had

"demanded information" from West LB, and that, in the year prior, all sixteen USD

LIBOR panel banks(including Defendants Deutsche Bank, JPMorgan Chase, Wells

Fargo and Bank of America et al) had received informal requests from regulators for

information regarding the setting of LIBOR during the period 2006-2008

164.   Furthermore, according to the Elliott Affidavit, counsel for the Cooperating Party

"stated that they have conducted an internal investigation of the Cooperating Party

that included interviews of employees of the Cooperating Party who had knowledge

of or participated in the conduct in question, as well as a review of relevant internal

documents."

165.   Currently, the DOJ is conducting an unprecedented joint investigation by both the

antitrust and criminal divisions of the DOJ into potential manipulation of LIBOR

rates for various currencies.

**Plaintiff And The consumers Suffered Damages Caused By Defendants'
Manipulation Of LIBOR**

166.   Plaintiff and the consumers received lower returns on LIBOR-based financial

instruments than they would have absent Defendants' conspiracy and unlawful

conduct.

167.   Accordingly, Plaintiff's and other consumer's injuries were direct, proximate,

foreseeable, and natural consequences of Defendants' manipulation of LIBOR

168.   Defendants engaged in a pattern of racketeering activity that affected interstate

commerce in violation of RICO, 18 U.S.C. § 1961, et seq.;

169.   Defendants  acted with the knowledge that interference or disruption of the

Plaintiff's relationships with issuers or sellers of USD LIBOR-based financial

instruments were certain or substantially certain to result from Defendants' unlawful

manipulation of LIBOR;

28

170.    Defendants et al intentionally misrepresenting their borrowing costs and conspiring with one another in doing so, Defendants and their co-conspirators engaged in mail fraud, wire fraud and/or bank fraud, in violation of applicable federal law;

171.    The duration of the mail fraud, wire fraud, bank fraud and conspiracy alleged herein and what were the acts performed by Defendants in furtherance of the conspiracy and the alleged conspiracy violated RICO;

172.    Defendants' manipulation of LIBOR caused damages to Plaintiff.

173.    The extent to which Plaintiff have sustained damages .

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

174.    Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and the public.

175.    Plaintiff did not know, nor could they reasonably have known, about Defendants' misconduct during the Period because Defendants' misconduct was, by its very nature, inherently self-concealing .

176.    Defendants' wrongful conduct was carried out in part through means and methods that were designed and intended to avoid detection, including numerous private telephone calls, email communications, and in-person meetings among the conspirators which, in fact, successfully precluded detection.

177.    **First,** Defendants' actual or reasonably expected costs of borrowing were not publicly disclosed, rendering it impossible for Plaintiff, to discover (without sophisticated expert analysis) any discrepancies between Defendants' publicly disclosed LIBOR quotes and other measures of those banks' actual or reasonably expected borrowing costs.

29

178.    **Second,** communications within and among the banks in connection with the conspiracy likewise were not publicly available, which further precluded Plaintiff, from discovering Defendants' misconduct, even with reasonable diligence.

179.    The FSA emphasized the secretive nature of the conspiracy in its findings, "[t]he misconduct was extensive and widespread" and included "an unquantifiable number of oral requests, which by their nature would not be documented . . . ."

180.    As a result of the efforts of UBS and other coconspirators to hide the conspiracy from regulators and the public, the FSA concluded that the "routine and widespread manipulation of the submissions was not detected by Compliance or by Group Internal Audit," despite five audits of the relevant business area during the Period. Id.

181.    As a result of the self-concealing nature of Defendants' collusive scheme, no person of ordinary intelligence would have discovered, or with reasonable diligence could have discovered, facts indicating Defendants were unlawfully manipulating LIBOR.

182.    Accordingly, the running of any Statute of Limitations has been suspended with respect to with respect to any claims which Plaintiffs and others have sustained as a result of the unlawful combination and conspiracy alleged herein and with respect to their rights to injunctive relief by virtue of the doctrine of fraudulent concealment.

183.    Additionally, Defendants undertook affirmative and concerted conduct to deceive the public and disclaim any manipulation of LIBOR.

184.    Therefore, Defendants had a motive to, and did, in fact, falsify the rates that they submitted to give the appearance that their funding costs were lower than they actually were.

185.    Defendants had a substantial economic incentive to try to push the aggregate reported USD LIBOR rate.

186.    Defendants were members of BBA's US-LIBOR Contributing Panel, along with

other 16 Banks in United States.

187.    Plaintiff's right of action in this complaint is based in part on matters

complained of in the Matter of: Barclays PLC, Barclays Bank PLC and Barclays

Capital Inc., CFTC Docket No. 12-25 and the June 27, 2012 Order Instituting

Proceedings Pursuant to Sections 6(c) and 69d) of the Commodity Exchange Act, as

Amended, Making Findings and Imposing Remedial Sanctions before the

Commodity Futures Trading Commission; and the Non-Prosecution Agreement

dated June 26, 2012 between the United States Department of Justice, Criminal

Division, Fraud Section, and Barclays Bank PLC and On July 31, 2012 Deutsche

Bank admitted about LIBOR, habitual, fraudulent, global  Rigging Scandal, which is

a series of **fraudulent** actions connected to the **Libor.**

188.    The statute of limitations on Plaintiff's right of action was tolled by the pendency

of that proceeding to the date of the filing this complaint.

189.    Plaintiff had no knowledge of the violations of the antitrust laws alleged in this

complaint, or of any facts that might have led to their discovery.

190.    Plaintiff first became aware of the unlawful conduct with relation to the LIBOR

rate manipulation on or about June 27, 2012, after the above government matters

surfaced after this complaint was filed.

191.    Plaintiff could not have uncovered the violations at an earlier date by the

exercise of due diligence, because the violations have been fraudulently concealed

by defendants through various means and methods designed to avoid detection of

the violation.

192.    Defendants have combined, contracted, and conspired with each other and with

other non-defendant co-conspirators to eliminate competition between themselves

and to suppress or eliminate the competition of others by various means, including

31

without limitation, prix fixing. This agreement between defendants   violates §§ 1

and 2 of the Sherman Antitrust Act (15 USC §§1-2)

193.   **Count 1**: Defendants have combined, contracted, and conspired with each other

and with other non-defendant co-conspirators to fix, raise, and stabilize the LIBOR

rate from 2005 through 2009 in violation of section 1 of the Sherman Antitrust Act.

(15 USC §§1-2)

194.   **Count 2**: Defendants have combined, contracted, and conspired with each other

and with other non-defendant co-conspirators to fix, raise, and stabilize the prices at

which they would sell LIBOR, Interest Only Adjustable Rate Mortgages in violation

of section 1 of the Sherman Antitrust Act. (15 USC §§1-2)

195.   A combination formed for the purpose and with the effect of raising, depressing,

fixing, pegging, or stabilizing LIBOR and/or the price of a commodity in interstate or

foreign commerce is illegal per se. *U.S. v Socony-Vacuum Oil Co. Inc.*, 310 US 150,

223 (1940).

196.   Barclay and, JPMorgan Chase, Wells Fargo, Bank of America and  Deutsche

Bank's policy/practice of manipulating the LIBOR market rate from 2005 through to

2009 violated the Sherman Antitrust Act §1, in that Barclay's and Defendants  have

combined, contracted, and conspired with each other and other non-defendant co-

conspirators to fix, raise and lower the LIBOR market rate  at which Barclays,

JPMorgan Chase, Wells Fargo, Bank of America and Deutsche Bank et al would

then contract with others to sell mortgage loans based on LIBOR including

Plaintiff's loan in this case, and also had the ability to unjustly enrich itself and also

bet for or against the default of the same loan pool as the SWAP and CAP provider.

197.   As a direct and proximate result of the violations charged above, Plaintiff have

been injured in his business or property in that Plaintiff was forced to pay interest on

their long term investment of 30 years for the purchase and then refinance of their

home based on a Adjustable rate, well above the LIBOR rate being manipulated and fixed by defendants from 2005 through 2009 which was a substantial factor in depressing the property value and/or resulting in the trust, Green Point MTA 2006-AR1 not readily modifying the loan, Plaintiff repeatedly requested, higher than what they would have paid in the absence of the violations.

198.    As a further direct and proximate result of the violations charged above, Plaintiff has been injured in their business or property in that they have lost and/or are losing their property due to the effect a manipulated index interest rate of LIBOR has on reducing the value of Plaintiff's property.

199.    All of the offenses charged above against, defendants were in furtherance of an attempt by defendants to monopolize, and defendants' actual monopolization of the market of the LIBOR interest rate used in the economy and specifically for consumer home loans in this case, throughout the states in the United States, in violation of section 2 of the Sherman Antitrust Act (15 USC §2).

200.    Plaintiff does not know the full extent of their damages, but believes that damages have been substantial. Wherefore Plaintiff demands judgment against defendants as set forth below.

**COUNT -IV**

**(Violations of RICO, 18 U.S.C. § 1961, et seq.)**

**(AGAINST ALL DEFENDANTS )**

201.    Plaintiff repeats, reaffirms and re-alleges the facts made above in all paragraphs as if more fully set forth and incorporated by reference herein, below.

**Defendants Formed A RICO Enterprise**

202.    Defendants' collective association, including through their participation together as members of the BBA's USD LIBOR panel, constitutes the RICO enterprise in this action.

33

203.    Every member of the enterprise participated in the process of misrepresenting their costs of borrowing to the BBA. Using those false quotes to cause the BBA to set USD LIBOR artificially low constitutes the common purpose of the enterprise.

### The Enterprise Has Perpetrated A Continuing Practice Of Racketeering

204.    For at least four years before this Complaint was filed, Defendants, in concert, made false statements to the BBA for the purpose and with the effect of manipulating USD LIBOR to be lower than it otherwise would have been.

205.    As a result of Defendants' scheme, Defendants earned hundreds of millions, if not billions, of dollars in wrongful profits, which they shared with the employees who perpetrated the scheme.

206.    The conduct of every party involved in the scheme is hardly an isolated occurrence but constituted a concerted and organized pattern and practice

207.    In perpetrating the scheme, each Defendant directly or indirectly through its corporate structure designed and implemented a substantially uniform effort to manipulate USD LIBOR. Defendants' daily making and communicating of quotes to the BBA comprise one common enterprise.

208.    For at least the past six years, Defendants have knowingly, intentionally, or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing the predicate acts of mail fraud within the meaning of 18 U.S.C. § 1341, wire fraud within the meaning of 18 U.S.C. § 1343, and bank fraud within the meaning of 18 U.S.C. § 1344(2), by knowingly and intentionally implementing the scheme to make false statements about their costs of borrowing, to manipulate USD LIBOR, which allowed Defendants to reap unlawful profits

209.    Defendants have committed the predicate act of mail fraud under 18 U.S.C. § 1341, thus triggering Section 1962(c) liability, by devising or intending to "devise a

34

scheme or artifice to defraud" purchasers and holders of USD LIBOR based financial instruments, and "for the purpose of executing such scheme or artifice or attempting so to do," placed or knowingly caused to be placed in a post office or authorized depository for mail matter, documents or packages to be sent or delivered by the Postal Service or a private or commercial interstate carrier, or received from those entities such documents or packages, including: (i) documents offering for sale USD LIBOR-based financial instruments; and (ii) correspondence regarding offerings of USD LIBOR-based financial instruments (the conduct described in this paragraph is referred to as the "Mail Fraud").

210.    On information and belief, the Mail Fraud is the result of Defendants "having devised or intended to devise a scheme or artifice to defraud" purchasers and holders of USD LIBOR-based financial instruments, for the purpose of obtaining money from those persons and  entities through "false or fraudulent pretenses, representations, or promises."

211.    By devising the scheme or artifice to defraud consumers as described herein, and for obtaining money from holders of USD LIBOR-based financial instruments through "false or fraudulent  pretenses, representations, or promises" about USD LIBOR-based financial instruments, Defendants transmitted or caused to be transmitted by means of "wire communication in interstate or foreign commerce, . . . writings, signs, signals,  [and] pictures," "for the purpose of executing such scheme or artifice," including by: (i) transmitting documents offering USD LIBOR-based financial instruments for sale; (ii) transmitting phony statements about their costs of borrowing; and (iii) transmitting e-mail communications relating to the process of determining, making, or transmitting phony statements about their borrowing costs.

35

212. In addition to that conduct, Plaintiff is informed and believes that Defendants used the mails and wires in conjunction with reaching their agreement to make false statements about their costs of borrowing, to manipulate USD LIBOR.

## The Racketeering Scheme Affected Interstate Commerce

213. Through the racketeering scheme described above, Defendants used the enterprise to improperly increase their profits to the detriment of purchasers and holders of USD LIBOR-based financial instruments, who resided in different states.

214. Plaintiff's allegations satisfy RICO's "interstate commerce" element because the racketeering claims alleged herein arise out of, and are based on, Defendants' use of the Internet or the mails across state lines as well as agreements between entities in different states to manipulate USD LIBOR.

215. Using those interstate channels to coordinate the scheme and transmit fraudulent statements to the BBA and consumers of financial products, among others, across state lines satisfies RICO's requirement of an effect on interstate commerce.

## Defendants Conspired To Violate RICO

216. Apart from constructing and carrying out the racketeering scheme detailed above, Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. § 1962(d).

217. The fraudulent scheme, as set forth above, alleges a violation of RICO in and of itself.

218. Defendants organized and implemented the scheme, and ensured it continued uninterrupted by concealing their manipulation of USD LIBOR from Plaintiff.

219. Defendants knew the scheme would defraud of USD LIBOR-based financial instruments of millions of dollars of interest, yet each Defendant remained a participant despite the fraudulent nature of the enterprise.

36

220.    At any point while the scheme has been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence.

221.    Rather than stopping the scheme, however, the members of the enterprise deliberately chose to continue it, to the detriment of Plaintiffs.

**Plaintiff Suffered Injury Resulting From Defendants' Pattern Of Racketeering Activity**

222.    Because Plaintiff unknowingly purchased and/or held USD LIBOR-based mortgage loan that paid interest at a manipulated rate, and in fact paid more interest than they would have absent the conspiracy, Plaintiff is victims of Defendants' wrongful and unlawful conduct.

223.    Plaintiff's injuries were proximate, foreseeable, and natural consequences of Defendants' conspiracy.

224.    There are no independent factors that account for the economic injuries suffered by Plaintiff, and the loss of money satisfies RICO's injury requirement.

225.    Plaintiff is entitled to recover treble damages for the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c)

226.    The pattern of racketeering activity, as described in this Complaint, is continuous, ongoing and will continue unless Defendants are enjoined from continuing their racketeering practices.

227.    Defendants have consistently demonstrated their unwillingness to discontinue the illegal practices described herein, and they continue their pattern of racketeering as of the filing of this Complaint.

228.    As a direct and proximate result of the subject racketeering activities, Plaintiff is

entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and

prohibiting Defendants from further engaging in their unlawful conduct.

**COUNT -V**
**(CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT §**
**59.1-198 of the VCPA, and 59.1-200(A)(I4) of the VCPA Against Defendants**
**LPS,  LPS DEFAULT SERVICES, DOCX AND DEFENDANT, BWW)**

229.    Plaintiff repeat, reaffirm and re-allege the facts made above in all paragraphs as if

more fully set forth and incorporated by reference herein, below.

230.    Defendant LPS is the largest provider in the United States of technology, data,

and services to mortgage lenders and servicers.

231.    LPS provides technology support to banks and mortgage loan servicers for

various processes throughout the life of a residential mortgage loan. It has over 30

subsidiaries throughout the nation. In relevant part, LPS is a provider of default,

foreclosure and bankruptcy technology service platforms for mortgage servicers.

232.    Defendant DocX is a subsidiary of LPS that was located in Alpharetta, Georgia

(acquired in 2005 by Fidelity National Financial and spun off under LPS in 2008 as

part of a corporate reorganization).

233.    DocX ceased operations in the spring of 2010. DocX performed various functions

for mortgage servicers, including but not limited to preparation, execution,

notarization and recording of lien releases, assignments of mortgage, and other

related documents through the "robo-signers".

234.    LPS Default Solutions provides mortgage servicers with administrative support

services in connection with foreclosure and bankruptcy proceedings, LPS Default

Solutions is another subsidiary of Defendant  LPS.

235.    LPS Default Solutions also engaged in illegal document execution and
notarization practices, including execution and notarization of mortgage-related
documents necessary for foreclosure or bankruptcy proceedings.

236.    Currently, Default Solutions provides services of manufacturing illegal
documents for its bank or servicer clients when a bank wants to foreclose.

237.    In providing default services to its bank or servicer-clients, Default Solutions uses
a technology platform called "Desktop" . "Desktop" performs a variety of functions,
but in part, is used by foreclosure attorneys to manage those respective processes.

238.    The foreclosure attorneys share their legal fees with non attorneys i.e. Defendants
LPS Default Services, which is illegal and an ethic violation.

239.    Defendants' deceptive acts and practices contributed to and facilitated many
faulty foreclosure and bankruptcy processes throughout the nation, and in Virginia,
occurring primarily during the height of the foreclosure crisis from 2007 till present.

240.    Concerning document execution practices. Defendants employed a high speed,
rate assembly-line process wherein employees in numerous instances inappropriately
signed and notarized documents. Some of those documents contained defects
including, but not limited to, unauthorized signatures, improper notarizations, or
attestations of facts not personally known to or verified by the affiant.

241.    A lot of the illegally manufactured Documents were used in Plaintiff's case when
two illegal attempts for foreclosure were made on Plaintiff's primary residence, in
2008 and 2009.

242.    Some of those documents contained unauthorized signatures or inaccurate
information relating to the identity, location, or legal authority of the signatory,
assignee, or beneficiary or to the effective date of the assignment.

243.    Some of those defective documents were recorded in local land records offices,
including the Loudoun County Circuit Court Lands Record, where Plaintiff's house is

39

located or executed with the knowledge that the documents would be filed in state

courts or used to comply with statutory, non-judicial foreclosure processes.

244.    At some time prior to November 1, 2009, employees and agents of Defendant

DocX, were directed by management of DocX to initiate and implement a program

under which employees signed documents in the name of other DocX employees,

without appropriate authority, DocX referred to these unauthorized signers as

"Surrogate Signers[1]" who signed countless foreclosure documents – with someone

else' name.

245.    The Surrogate Signers executed documents in the name of other DocX employees

without indicating that the documents had been signed by a Surrogate Signer.

246.    Notaries public employed by DocX or as agents of DocX completed the notarial

statements on the Mortgage Loan Documents that were executed by Surrogate

Signers and slated that those documents had been properly acknowledged, signed,

and affirmed in their presence by the person whose name appeared on the document,

when in fact the Surrogate Signer had signed the name of another person or signed

outside the presence of the notary, or both.

247.    Concerning Default Solutions, LPS' Desktop system inappropriately influenced

attorney behavior, in part by inhibiting communication between the servicer and its

attorney, and by incentivizing speed and volume over accuracy.

---

[1] At Lender Processing Services workers who signed tens of thousands of sworn foreclosure affidavits with
someone else' name were called "surrogate signers", according to, a former LPS worker who admitted to
notarizing as many as 1,000 sworn affidavits daily – often without witnessing the signature. Employee said
despite "raised eyebrows" her supervisors never used the word "forge" and repeatedly told workers the
practice of signing someone else' name on a sworn affidavit was legal. The employee detailed the
company's foreclosure document processing practices during a deposition in an Orange county foreclosure
case . LPS, a Jacksonville company, charges a fee to locate and assemble the documents necessary to file a
foreclosure. The Florida Attorney General and many other states have received complaints about the firm
and its documents preparation practices. According to the AG's web site, LPS and a defunct subsidiary,
Docx, produced documents "that to even the untrained eye, appear to be forged and/or fabricated as the
signatures of the same individual vary wildly from document to document. These documents are then used
to gain standing for the banks in a foreclosure suit."

248.   The VCPA generally prohibits [2] fraudulent acts and practices committed by or through a "supplier" [3] in connection with a "consumer transaction [4]," as those terms are defined in § 59.1-198 of the VCPA.

249.   The Defendants are now, and were at all relevant times mentioned herein, agents of "suppliers" of "goods" or "services" and engaged in "consumer transactions," as those terms are defined in § 59.1-198 of the VCPA, by selling and providing mortgage default services to supplier mortgage loan servicers for mortgages held in Virginia.

250.   The costs or charges for the work performed by the Defendants were transferred by suppliers to consumers in Virginia including the Plaintiffs in this case.

251.   The Defendants, in the course of selling mortgage-related document execution and default services to supplier servicers, have engaged in a course of trade or commerce which constitutes deceptive or misleading practices, and is therefore unlawful under § 59.1-200(A)(14) of the VCPA by:

a   Creating, signing, recording, or notarizing documents that contained false, deceptive, or misleading information, assertions, or averments, such as:  1) unauthorized signatures;  2 )  improper notarizations;  3)   attestations of facts not personally known to or verified by the affiant; or inaccurate information relating to the identity, location, or legal authority of the signatory, assignee, or beneficiary, or to the effective date of the assignment.

---

[2] The prohibited practices, the VCPA prohibits the use of any "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction," committed by or through a supplier, pursuant to § 59.1- 200(A)(14).

[3] The term "supplier" is defined in § 59.1-198 of the VCPA to include "a seller, lessor, or licensor who advertises, solicits or engages in consumer transactions, or a manufacturer, distributor, or licensor who advertises and sells, leases or licenses goods or services to be resold, leased, or sublicensed by other persons in consumer transactions. The term "services" is defined in § 59.1-198 of the VCPA to include, among other items, "work performed for the supplier by an agent whose charges or costs for such work are transferred by the supplier to the consumer or purchaser as an element of the consumer transaction.

[4] The term "consumer transaction" is defined in § 59.1-198 of the VCPA generally to mean and include "[t]he advertisement, sale, lease, license or offering for sale, lease or license of goods or services to be used primarily for personal, family, or household purposes."

b   Initiating and facilitating a system by which an attorney or law firm and their client could not appropriately communicate;

c   Initiating and facilitating a system by which attorney speed and volume was favored over accuracy.

252.   The VCPA authorizes Plaintiff to seek among other relief, restitution (§ 59.1-205) for any amounts that might have been acquired from persons by means of a violation of 59.1-200, civil penalties of not more than $2,500 per violation (§ 59.1-206), investigative costs and reasonable expenses not to exceed $1,000 per violation (§ 59.1-206), and attorney's fees (§ 59.1206)

253.   The Defendants willfully committed the violations described of § 59.1-200(A)(14) of the VCPA

254.   Defendants **LPS, LPS DEFAULT SERVICES, DOCX AND** through Defendant BWW, created three illegal Deeds of Appointment of Substitute Trustee on November 14, 2008 **(EXHIBIT-D)** and on February 20, 2009 **(EXHIBIT-E)** and on August 13, 2012 **(EXHIBIT-F)**

255.   These Deeds of Appointment of substitute Truss were created under the supervision of Defendant BWW, through the famous robo-signers, and Defendant BWW was involved in these frauds, when questioned and investigated the Defendant BWW changed its name from Bierman Geesing & Ward LLC to its present name BWW Law Group LLC

256.   WHEREFORE, the Plaintiff, prays that this Court enter an order:

a   Issuing a permanent injunction prohibiting the Defendants, their agents, employees) and all other persons and entities, corporate or otherwise, in active concert or participation with any of them) from engaging in deceptive or misleading conduct;

42

b    Ordering Defendants to disgorge all revenues, profits, and gains achieved in

whole or in part though the acts or practices complained of herein;

c    Grant judgment to the Plaintiffs against the Defendants for civil penalties in the

amount of $2,500 for each and every separate willful violation proven at trial,

pursuant to § 59.1-206;

d    Grant judgment to Plaintiff against the Defendants for their costs, reasonable

investigative expenses, and attorney's fees, pursuant to § 59.1-206; and

e    Granting such other and further relief as the Court deems equitable

## COUNT-VI
## SLANDER OF TITLE/PETITION TO QUIET TITLE AGAINST ALL DEFENDANTS

255.    Plaintiff re-alleges and affirms each preceding paragraph of this

Complaint and incorporate such as if alleged a new.

256.    Defendants, and each of them, disparaged Plaintiff's exclusive valid title

by and through the illegally manufacturing, preparing, posting, publishing, and

recording of the documents previously described herein, including, but not

limited to, Substitute Trustee Deed.

257.    Said Defendants knew or should have known that such documents were

improper in that at the time of execution and delivery of said documents,

Defendants had no right, title, or interest in the property.

258.    These documents were naturally and commonly to be interpreted as

denying, disparaging, and casting doubt upon Plaintiff's legal title to the property.

259.    By posting, publishing, and recording said documents, Defendant's

disparagement of Plaintiff's legal title was made to the world at large.

260.    As a direct and proximate result of Defendants' conduct in publishing

these documents, Plaintiff's title to the property has been disparaged and

43

slandered, and there is a cloud on the Plaintiff's title, and plaintiffs have suffered, and continue to suffer, damages in an amount to be proved at trial.

261.    As further proximate result of Defendant's conduct, Plaintiff has incurred expenses in order to clear title to the property. Moreover, these expenses are continuing, and Plaintiff will incur additional charges for such purpose until the cloud on Plaintiff's title to the property has been removed. The amount of future expenses and damages are not ascertainable at this time.

262.    As further proximate result of Defendant's conduct, Plaintiff has suffered humiliation, mental anguish, depression and emotional and physical distress, resulting in the loss of sleep and other injuries to their and their health and well being, and continue to suffer such injuries on an ongoing basis. The amount of damages shall be proven at trial.

263.    At the time that the false and disparaging documents were created fraudulently through the robo-signers, and published by the Defendants. Defendants knew the documents were false and created and published them with the malicious intent to injure Plaintiff and deprive them of their exclusive rights, title, and interest in the property, and to obtain the property for their own use by unlawful means.

264.    The conduct of the Defendants in manufacturing, in publishing the documents described above was fraudulent, oppressive, and malicious. Therefore Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants for their malicious conduct and deter misconduct in future.

## COUNT-VII
## QUIET TITLE AGAINST ALL DEFENDANTS

265.    Plaintiff re-alleges and affirms each preceding paragraph of this

Complaint and incorporate by reference all proceeding paragraphs as though

fully set forth herein.

266.    The Defendants have knowingly and maliciously communicated, in

writing, false statements that have the effect of disparaging the title to

Plaintiff's property. The Plaintiff has incurred special damage as a result.

267.    It is well established in Virginia Law that equity has inherent jurisdiction

to Quiet Title to land and remove a cloud therefrom. Day V. Vaught & Usilton,

Inc., 193 Va 168, 171, 67, S.E.2d 898, 901 (1051). An action to Quiet Title is

based on the premise that a person with good title to certain real or personal

property should not be subjected to various future claims (i.e. clouds) against the

title. Maine V. Adams, 277 Va. 230, 238, 672, S.E.2d 862, 866 (2009). A

plaintiff asserting a quiet title claim must plead and prove that he/she has

superior title to the property over the defendants. See id

268.    Defendant Green Point Funding  Inc securitized Plaintiffs' loan with a

bunch of loans, but did not do the transfers properly;

Green Point Mortgage Funding Inc (Nominal Lender on DOT & Note )→ EMC
Mortgage Corporation (Seller/Sponsor/Servicer)→ Bear Stearns Asset Backed
Securities I LLC (DEPOSITOR) → BEAR, STEARNS & CO. INC(Securities
Underwriter) → Dealers→ Agents→ Investors



269.    **First**, there is the possibility of duplicative claims. This is unlikely,

although with the presence of warehouse fraud it can hardly be discounted as an

impossibility. The same mortgage loan has been sold multiple times by the same

lender as part of a warehouse fraud. Plaintiff's loan was sold in more than one

MBS Trusts by the Defendants et al. That could conceivably result in multiple

claimants.

270.    The Plaintiffs should only have to pay once. Similarly, if the loan wasn't

properly securitized, then the depositor(Bear Stearns Asset Backed Securities I

LLC) or seller (EMC Mortgage Corporation) could claim the loan as its property.

Again, potentially multiple claimants, on Plaintiff's loan.

271.    **Second**, the Plaintiffs had a real interest in dealing with the right creditor

because different creditors have different incentives and ability to settle.

Plaintiffs had rather see negotiated outcomes than foreclosures, but Defendants

JPMorgan Chase, EMC and Wells Fargo, trustee of the dissolved Trust,  Green

Point MTA Trust 2006 AR1(now dissolved in 2008), have very different incentives

and ability to settle than banks that hold loans in portfolio. PSA terms, liquidity,

capital requirements, credit risk exposure, and compensation differ between

services/trustees and portfolio lenders. If the loans weren't properly transferred

via the securitization, then they are still held in portfolio by someone unknown to

Plaintiff. This means Plaintiff has a strong interest in litigating against the real

party in interest and not these Defendants who all are acting ultra vires.

272.    The homeowners, Plaintiff in this case should be able to challenge

standing of these imposters, because Plaintiff have real legal interests at stake in

litigating against the right party, which is unknown to Plaintiff and can appear

any time in future.

273.     In Plaintiff's case illegal Assignments of Deed of Trust were illegally manufactured and signed by the robo-signers, SHOULD have been red flag #1.

274.     Flag #2 should have been MERS. R.K. and Hultman both admitted in deposition that MERS never holds title or interest in notes. The case law is simply too long at this point to list but Ibanez is a great start.

275.     Flag #3 should have been that, according to both the Prospectus Supplement 424(b)5 and PSA for the Green Point MTA Trust 2006 AR1, the closing and cut-off dates were February 28, 2006 and February 1, 2006 respectively.

276.     These documents appear to have been fraudulent and as complaint assert – were intentionally prepared and executed to unlawfully confiscate the property from the homeowners, Plaintiff in this case.

277.     If the investors include the borrowers, the fraudulent assignment of mortgages will surface and the REMIC fraud will float to the top like a dead body in a botched murder case…. and somebody will be stuck with paying the IRS – even if the investors win the case and get their investments back.

278.     According to this PSA, the dissolved trust, Green Point MTA Trust 2006 AR1 never legally owned the Plaintiff's Note and therefore never had standing to foreclose.

---

[5] The largest key to REMICs is that they are required to be passive vehicles, meaning that mortgages cannot be transferred in and out of the trust once the closing date, has occurred, unless the trust can meet very limited exceptions under the Internal Revenue Code. I.R.C. §860G. The 90 day requirement is imposed by the I.R.C. to ensure that the trust remains a static entity. However, since the mortgage-backed securities trust controlling documents, the Pooling & Servicing Agreement (PSA), requires that the trustee ( Wells Fargo and Deutsche Bank Trustee of Dissolved Trust) and servicer (JPMorgan Chase and Bank of America) not do anything to jeopardize the tax-exempt status; PSAs generally state that any transfer after the closing date of the trust is invalid. Defendants illegally manufactured Assignments after more than 03 years are not valid and are fraud upon court and on Plaintiffs.

279.    Even IF MERS had title (Deed of Trust) and no interest in the promissory

note, MERS could not assign the Plaintiff's Note directly into the Green Point

MTA Trust 2006 AR1. It would have had to pass through, Bear Stearns Asset

Backed Securities I LLC as Depositors in Plaintiff's case.

280.    The Mortgage Loan Purchase Agreement for the Plaintiff's Note

memorializing this should have been made to be produced through discovery for

examination.

281.    Then, of course, there is the examination of the MERS Milestone Report

for the Plaintiff's note to see where it has been through the years which should

have also been produced through discovery.

282.    Plaintiff have a vested interest in determining that the ONE AND ONLY

entity entitled to foreclose gets the property. This is especially true for Plaintiffs

who live in full recourse states.

283.    The assignments illegally manufactured by Defendants through the

Defendants LPS, DocX and LPS Default Services in this instance attempts to

memorialize a transaction that never actually took place, and is a baldly

fabricated piece of false evidence by the Defendants et al who are acting ultra

vires.

284.    The transfers in violation of the PSA are void under New York trust law.

In order to foreclose, judicially or non-judicially, the Defendants  must have

standing to bring the claim. If the Assignment of Mortgage is faulty or in fraud

there likely is no standing.

285.    An Assignment of Mortgage to a NY Trust is governed under NY Trust

laws. Under New York Trust Law "every sale, conveyance or other act of the

Case 13-01087-BFK   Doc 1   Filed 04/03/13   Entered 04/03/13 16:11:11   Desc Main
Document   Page 50 of 82

trustee in contravention of the trust…is void." New York Estates, Powers and

Trusts § 7-2.4.

286.     New York trust law requires strict compliance with the trust documents;

any transaction by the trust that is in contravention of the trust documents is void,

meaning that the transfer cannot actually take place as a matter of law.

287.     Therefore, if the transfer for the notes and mortgages did not comply with

the PSA, the transfer would be void, and the assets would not have been

transferred to the trust. Moreover, in many cases the assets could not now be

transferred to the trust." Source: Congressional Oversight Panel, Examining the

Consequences of Mortgage Irregularities for Financial Stability and Foreclosure

Mitigation, November 16, 2010 page 19.

288.     If Congress recognizes that these Assignments are void, which means the

Trust has no standing.

289.     Plaintiff alleges that Defendants the foreclosing party has "unclean hands"

rendering the equitable remedy of foreclosure unenforceable.

290.     By concealing the fact that untimely delivery was made to the REMIC

trust in contravention of the explicit requirements of the PSA, a fraud has been

perpetrated upon investors, Plaintiff and the IRS.

291.     The largest key to REMICs is that they are required to be passive vehicles,

meaning that mortgages cannot be transferred in and out of the trust once the

closing date has occurred, unless the trust can meet very limited exceptions under

the Internal Revenue Code. I.R.C. §860G.

292.     The 90 day requirement is imposed by the I.R.C. to ensure that the trust

remains a static entity.

49

293.     There are two notes, an Article 9 note secured by an (Article 3 note secured by a real estate lien.) Security for a Mortgage Backed Security Certificate note created under Article 9 would attach and perfect under UCC Article 9 at the time the Article 9 note was created.

294.     As this creation of the securities note requires true sales of the underlying Article 3 note and it's security if which is real estate would be required to comply with local laws of jurisdiction.

295.     Before we know what right can be enforced regarding the Article 9 note's collateral, the legal standing of the Article 3 note collateral must be established.

296.     Plaintiff takes that meaning that you have an Apple and you convert it into Apple Juice. Once Juice there is no way to convert it back into an Apple.

297.     If the Note has or claims to have been converted into Securitized Instrument (being a Certificate or a Bond) cannot fall under the UCC Code but forever under the Securitization Code.

298.     How then can the Defendant Deutsche Bank and Wells Fargo (both terminated Trustees of Dissolved Trusts bring this Apple Juice into the court and tell the court that it is an Apple?

299.     As to the Foreclosure, how can Defendants et al can foreclose on a Securitized Instrument and how do the County's allow a Credit Bid of a Securitized Instrument to purchase a property?

300.     Because the Note was destroyed by operation of law when Defendants et al added terms and conditions on it, therefore the Note lost its original shape.

301.    Defendants have no legally enforceable claim, interest or standing to sue the note or Deed of Trust in question and the claim is a cloud on the Plaintiff's tile and should be quieted under Virginia Law

302.    Plaintiff are the rightful owners and legal titleholders of the subject property

303.    Defendantsunlawfully caused a cloud to be recorded against the title of the property and have caused to be sent notices of default and foreclosures, and have served and filed mortgage documents that claim an interest in the property of the Plaintiff, when Plaintiff is not in default.

304.    Any purported transfer of any interest in the real estate was wrongful and invalid because the endorsements, assignments, foreclosures or purported foreclosures were invalid and were not conducted in accordance with the laws of Virginia

305.    Defendants Deutsche Bank and Wells Fargo, knew or should have known that such transfers were wrongful and invalid and the publication of an ownership interest in the property is, therefore false.

306.    The recording of the mortgages published the information to third parties

307.    Because of said wrongful publication of an ownership interest in the property, Plaintiff has incurred damages and will continue to incur attorney's fees and costs related to this litigation, in an amount to be proven at trial.

308.    An actual controversy has arisen and now exists between the Plaintiff and the Defendants et al concerning their respective rights and duties regarding the note and DOT.

309.    Plaintiff contends that pursuant to the loan, Defendants do not have authority to foreclose upon and sell the property

51

310.    Plaintiff, therefore, requests a judicial determination of the rights,

obligations and interest of the parties with regard to the property, and such

determination is necessary and appropriate at this time under the circumstances

so that all parties may ascertain and know their rights, obligations and interests

with regard to the property.

311.    Plaintiff request a determination of the validity of the MBS Trusts, which

were dissolved in 2008 and Defendants Deutsche Bank and Wells Fargo were

terminated as Trustee of dissolved trust which occured in 2008, and Defendants

are keeping it alive with their illegally manufactured documents, which are

clouding the title of Plaintiff's property more.

312.    Plaintiff requests a determination of the validity of the duties of Defendant

Deutsche Bank , Wells Fargo, as alleged Trustee of The dissolved MBS Trusts.

313.    Plaintiff requests a determination of the validity of Deed of Trust as of the

dates the Note was assigned without concurrent assignation of the underlying

Deed of Trust.

314.    Plaintiff requests a determination of the validity of the Deed of

appointment of Substitute Trustee.

315.    Plaintiff requests a determination of whether any Defendant has authority

to foreclose on the property, when Defendants are not creditors.

316.    A "true sale" of mortgages into the securitization trusts did not happen.

317.    A "true sale" is required under REMIC rules. The REMIC status then

triggers IRS tax ramifications. Every securitization trusts claims that the loan

passes through several assignments and finally on a closing date to the trust.

which never happened in Plaintiff's case.

318.    Notes assigned in blank become bearer paper therefore it is required

that receipt of delivery and acceptance from the originator to the sponsor, a

receipt of delivery and acceptance from the sponsor to the depositor, and a receipt of delivery and acceptance from the depositor to the trustee are all required. In Plaintiff's case these are missing.

319.    Moreover, the custodian must take possession of the original loan documents including the original notes before the loan is considered to be owned by the trust. Why Deutsche Bank National Trust Company and Wells Fargo falsified as per Article II, Section 2.02?

320.    Plaintiff requests all adverse claims to the real property be must determined by the decree of this court

321.    Plaintiff request the decree declare and adjudge that Plaintiff is entitled to the exclusive possession of the property.

322.    Plaintiff requests the decree declare and adjudge that Plaintiff owns in fee simple, and are entitled to the quiet and peaceful possession of the property described above.

323.    Plaintiff requests the decree declare and adjudge that defendants, and each of them, and all persons claiming under them, have no estate, right, title, lien, or interest in or to the real property or any part of the property.

324.    For declaratory relief, including but not limited to the following Decrees of this court that;

325.    Plaintiffs are the prevailing party;

326.    The Trustee of dissolved Trusts, Defendant Deutsche, and Wells Fargo have no enforceable secured or unsecured claim against the property;

327.    The Sponsor EMC and Bank of America has no enforceable secured or unsecured claim against the property;

328.    The Depositors have no enforceable secured or unsecured claim against the property;

329.     Mortgage Originator, nominal lender has no enforceable secured or

unsecured claim against the property;

330.     Determines all adverse claims to the real property in this proceeding;

331.     Plaintiff is entitled to the exclusive possession of the property;

332.     Plaintiff owns in fee simple, and are entitled to the quiet and peaceful

possession of the above described real property.

333.     Defendants and each of them, and all persons claiming under them, have

no estate, right, title, or interest in or real property or any part of the property

334.     Plaintiff seeks a declaratory judgment against Defendants stating that

Defendants have violated;

Paintiff's rights and that the Defendants had and have no right to hold Deed of

Trust in the name of Deutsche Bank National Trust Company and Wells Fargo

/or foreclose on the property and that the Defendants are entitled to no further

payments from the Plaintiff or recognition in Plaintiffs' Title to his property.

335.   The Plaintiff is entitled to a reformation of these notes as unsecured notes or as

partially or wholly discharged notes and a right to reformation of the contracts with

the persons or entities who are owed obligations because of funding of the loans of

the Plaintiff.

336.     Plaintiff requests the Trial by Jury

WHEREFORE, Plaintiff prays that:

A. The Court award Plaintiff compensatory damages no less than $55,000.00

and punitive damages in an amount to be determined by the fact finder;

B. The Court award him attorney's fees, interest and costs, or any other such

relief as the Court may deem appropriate.

C. Rescission of the entire Mortgage and note amounting to clear title to

property with fixtures as a result of the aforementioned, and As a result of

C. Rescission of the entire Mortgage and note affording for clear title to property

with fixtures as a result of the aforementioned, and As a result of Plaintiffs

aforesaid violations, , for each and every violation, and

D. Damages as a result of the aforementioned violations, to be fixed and awarded by the

Court, and

E. Damages for the Unfair and Deceptive Acts and Practices in the amount of $4000.00

for each and every violation, and

F. Damages in the amount of three times the interest paid and clear title to the property

stemming from the usurious interest, and

G. Judgment against Defendants for return of the down payment, and other payments,

as well as interest on the above amount, and

H. Cost of litigation as provided in Title 15 United States Code, Section 1601 et. seq.,

and

I. The current value of the property is $ 699,000.00 and in the context of "underwater"

real estate "cram down" allows the bankruptcy courts to modify mortgage loan .

J. Any other relief the court deems just and proper.

Respectfully submitted,

Date 04/3/2013

Syed Aftab Kazmi
43007 JANNEYS CORNER COURT
ASHBURN VIRGINIA 20148

## CERTIFICATE OF SERVICE

I hereby certify that the Copy of the above Adversary Proceedings was mailed to the
following via USPS First Class Mail, postage paid on April 3, 2013;

a) Ms. Judy A. Robbins, (Chapter-11) , Office of the US Trustee, Region - 4,  115
   South Union Street, Room No. 210 Alexandria VA 22314
b) Green Point Mortgage Funding Inc, 100 Wood Hollow Dr. Novato, CA 94945
c) EMC Mortgage Corporation, 909 Hidden Ridge Drive, Suite 200, Irving, Texas
   75038

53

e) Bear Stearns Asset Backed Securities 1 LLC, 383 Madison Avenue, New York, New York 10179

f) BEAR, STEARNS & CO. INC, 383 Madison Avenue, New York, New York 10179

g) Bear Stearns Capital Markets Inc, 383 Madison Avenue, New York, New York 10179

h) Green Point Mortgage Funding Trust 2006-AR1, 6445 Nicollet Ave, Richfield, MN 55423

i) GSR Trust 2005-HEL-1, 85 Broad Street, New York, New York 10004

j) Wells Fargo Bank NA, 9062 Old Annapolis Road, Columbia, Maryland 21045-1951

k) Equity Trustee LLC, 2020, 14th Street N # 250 Arlington, VA 22201

l) BARCLAYS BANK PLC, 745 Seventh Avenue, New York, NY 10019

m) BARCLAYS CAPITAL REAL ESTATE, INC, 200 Park Ave New York, NY 10166

n) Lender Processing Services, Inc, 601 Riverside Avenue, Jacksonville, Florida 32204

o) LPS Default Solutions Inc, 601 Riverside Avenue, Jacksonville, Florida 32204

p) DOCX, LLC, 601 Riverside Avenue, Jacksonville, Florida 32204

q) MERSCORP Holdings, Inc, Mortgage Electronic Registration System Inc ("MERS 1, MERS 2, MERS 3"), 1818 Library Street # 300 Reston, VA 20190

r) Bank of America NA, PO Box 5170 Simi Valley CA 93062

s) Deutsche Bank National Trust Company, 1761 East St. Andrew Place, Santa Ana, California 92705-4934

t) BWW Law Group LLC, 4520 East West Highway Suite 200 Bethesda Maryland 20814

u) DOES 1 through 50 et al

Date _April 3rd, 2013_

Syed Aftab Kazmi
43007 JANNEYS CORNER COURT
ASHBURN VIRGINIA 20148

56

*CASE No. 13-10897*

1

TO:     JP Morgan Chase,
EMC Mortgage and Wells Fargo Bank NA 3415 Vision Drive Columbus OH 43219

Re:     **NOTICE OF RESCISSION MORTGAGE LOAN TRANSACTION, ACCOUNT NO. 0014367833 MORTGAGE IDENTIFICATION NUMBER ("MIN NO) 1000138-0087600904-0, ORIGINAL LOAN NO. 0087600904, PROPERTY LOCATED AT 43007 JANNEYS CORNER COURT ASHBURN VIRGINIA 20148**

Dear Sir,

1. We the undersigned borrowers, Syed Aftab Kazmi and Afshan Kazmi, both husband and wife hereby notify you and to all the assignors on our loan that we are rescinding this loam transaction **as a Defense to Foreclosure, rescission by Recoupment After Three-Year Period.** 15 U.S.C. § 1635(i)(3) and Pursuant to new TILA (Reg Z), which is law now, 15 U.S.C. 1641 – specifically section 131(g),
2. You are required to notify the borrowers, Syed Aftab Kazmi and Afshan Kazmi, in this case in writing within 30 days after their mortgage loan is sold or otherwise transferred. The notice must include:

   a) The assignee's identity, address and phone number;
   b) The date of transfer;
   c) Contact information for an agent or party having authority to act on behalf of the assignee;
   d) The location of the place where transfer of ownership of the debt is recorded; and
   e) Any other relevant information regarding the assignee.

3. You have failed to notify as required pursuant to 15 U.S.C. § 1635(i)(3) and Pursuant to TILA (Reg Z) 15 U.S.C. 1641 – specifically section 131(g) as per time required.
4. The notice must be given on or before the 30th calendar date after the date the new owner acquires the loan, with *the acquisition date deemed to be the date that the acquisition is recognized in the new owner's books and records.*



5. The notice must be given even where the new and former owners are affiliates, but a combined notice may be sent where one company acquires a loan and subsequently transfers it to another company so long as the content and timing requirements are satisfied as to both entities.
6. The required information also includes a disclosure of the location where ownership of the debt is recorded. If a transfer has not been recorded in the public records at the time the notice is provided, a new owner may satisfy this requirement by stating that fact.
7. We never received any such notice from the parties involved in the sale of our loan who are in violation of TILA continuously.
8. We are informed and believe, and allege thereon, that each of the parties unknown to us failed to sent the notice with information to us, pursuant to TILA (Reg Z) 15 U.S.C. 1641 – specifically section 131(g) and is responsible in some manner for the violation
9. Thus, assignees are not exempt from the duty to provide notice merely because the mortgage (as opposed to the note) is in the name of Defendant Mortgage Electronic

*CASE No   13-10897*

2

Registration Systems (MERS), when Defendant MERS is not creditor and MERS name is not there on the Promissory Note.

10. An assignee that violates this notice requirement will be subject to civil penalties under Section 130(a) of TILA. 15 USC § 1640(a).

11. The transfer notice requirement applies to all closed-end and open-end consumer-purpose mortgage loans secured by a consumer's principal residence. It requires any person that acquires more than one mortgage loan in any 12-month period to provide a transfer notice without regard to whether the new owner would otherwise be a "creditor" subject to TILA.

12. If you will not follow the second step of rescission with in 20 days, by cancelling the security or filing a declaratory action to challenge our rescission in court, (Official Staff Commentary §§ 226.15 (d) (2) -3, 226.23 (d) (2) -3.), then by operation of law the security interest and promissory note automatically becomes void and the consumer is relieved of any obligation to pay any finance or other charges (15 USC 1635(b); Reg. Z-226.15(d) (1),226.23(d)(1). See Official Staff Commentary § 226.23(d)(2)-1

13. Please govern yourselves and inform all the parties still unknown to us.

_____        _____

Syed Aftab Kazmi                           Afshan Kazmi

Date _08-25-2012_        Date   _08/25/2012_

Loan Number: 0087600904

# ADJUSTABLE RATE NOTE
# (Monthly Treasury Average Index – Payment and Rate Caps)

MIN: 100013800876009040

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED AND MY INTEREST RATE INCREASES ARE LIMITED.

October 11, 2005                    Fairfax                         VIRGINIA
[Date]                              [City]                          [State]

43007 JANNEYS CORNER CT., ASHBURN, VA 20148
[Property Address]

## 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $1,150,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GreenPoint Mortgage Funding, Inc.. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.    INTEREST

### (A)    Interest Rate

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.000%. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B)    Interest Change Dates

The interest rate I will pay may change on the first day of December, 2005, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

The new rate of interest will become effective on each Interest Change Date.

### (C)    Interest Rate Limit

My interest rate will never be greater than 12.000%.

### (D)    The Index

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (E)    Calculation of Interest Rate Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Two and 750/1000ths** percentage points (2.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest

EXHIBIT
B

G P M W D 0 0 8 7 6 0 0 9 0 4 1 4 0

one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

3. **PAYMENTS**

(A) **Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **December 1, 2005**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **November 1, 2045**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "**Maturity Date.**"

I will make my monthly payments at P.O. Box 1093, Branford, CT 06405-8093 or at a different place if required by the Note Holder.

(B) **Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $2,907.85. This amount may change.

(C) **Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of December, 2006, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D) **Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

(E) **Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

(F) **Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to one hundred ten percent (110%) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount which would be sufficient to repay my then unpaid principal in full on the Maturity Date at my current interest rate in substantially equal payments.

(G) **Required Full Payment**

On **December 1, 2010** and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

4. **NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will contain the interest rate or rates applicable to my loan for each month since the prior notice or, for the first notice, since the date of this Note. The notice will also include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

Virginia Adjustable Rate Note (Monthly Treasury Average Index)— Single Family--Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding                          Page 2 of 4                          Modified Form 3602 01/01
October 10, 2005                                                                 Modified By GreenPoint Mortgage Funding H94684VA 06/05

G P M W D 0 0 0 8 7 6 0 0 9 0 4 1 4 0

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)   Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)   Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)   Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)   No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)   Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder

Virginia Adjustable Rate Note (Monthly Treasury Average Index)— Single Family—Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding                    Page 3 of 4                    Modified Form 3602 01/01
October 10, 2005                                                  Modified By GreenPoint Mortgage Funding H94684VA 06/05

G P M W D 0 0 8 7 6 0 0 9 0 4 1 4 0

may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor and waive the benefit of the homestead exemption as to the Property described in the Security Instrument (as defined below). "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
SYED KAZMI                       -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

*[Sign Original Only]*

**Virginia Adjustable Rate Note (Monthly Treasury Average Index)— Single Family--Freddie Mac UNIFORM INSTRUMENT**
GreenPoint Mortgage Funding                    Page 4 of 4                    **Modified Form 3602 01/01**
October 10, 2005                                          Modified By GreenPoint Mortgage Funding H94684VA 06/05

G P M W D 0 0 8 7 6 0 0 9 0 4 1 4 0

## CERTIFIED TRUE COPY

After recording please return to:

GreenPoint Mortgage Funding, Inc.
*[Company Name]*

*[Name of Natural Person]*

981 Airway Court, Suite E
*[Street Address]*

Santa Rosa, CA, 95403-2049
*[City, State Zip Code]*

Prepared by:

Anne Pfannenstiel
*[Name of Natural Person]*

Mid-Atlantic Branch Office
*[Company Name]*

12015 Lee Jackson Highway Suite 210
*[Street Address]*

Fairfax, VA 22033
*[City, State Zip Code]*

Parcel Identification No.: 158109487000

_____ *[Space Above This Line For Recording Data]* _____

Westminster Title Agency, Inc.
11240 Waples Mill Road
Suite 101
Fairfax, VA 22030

# DEED OF TRUST

MIN 100013800876009040

*Kazmi*

The following information, as further defined below, is provided in accordance with Virginia law:
This Deed of Trust is given by SYED KAZMI and Afshan ~~Kazimi~~ Tenants By Entirety
as Borrower (trustor), to Suellen Wohlfarth, as Trustee, for the benefit of "MERS" is Mortgage Electronic
Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and
Lender's successors and assigns, as beneficiary.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11,
13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated October 11, 2005, together with all Riders to
this document.

(B)    "Borrower" is SYED KAZMI and Afshan Kazmi, Tenants By Entirety
Borrower is the trustor under this Security Instrument.

(C)    "Lender" is GreenPoint Mortgage Funding, Inc..
Lender is a Corporation organized and existing under the laws of the State of New York.  Lender's address is 100
Wood Hollow Drive, Novato, CA 94945.

(D)    "Trustee" is Suellen Wohlfarth.
Trustee (whether one or more persons) is a Virginia resident and/or a United States or Virginia chartered corporation
whose principal office is located in Virginia.  Trustee's address is GreenPoint Mtg., 12015 Lee Jackson Hwy.
Suite 210, Fairfax, VA 22033.

G P M W D 0 0 8 7 6 0 0 9 0 4 1 1 7

EXHIBIT
C

(E)     "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F)     "Note" means the promissory note signed by Borrower and dated **October 11, 2005.**
The Note states that Borrower owes Lender **One Million One Hundred Fifty Thousand and 00/100ths Dollars** (U.S. **$1,150,000.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **November 1, 2045** .The interest rate stated in the Note is 1.000%. If this Security Instrument is an adjustable rate mortgage loan, this initial rate is subject to change in accordance with the attached Adjustable Rate Rider.

(G)     "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)     "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)     "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Revocable Trust Rider | |
| ☒ Other(s) *[specify]* **OCCUPANCY RIDER** | | |

(J)     "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)     "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)     "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)     "Escrow Items" means those items that are described in Section 3.

(N)     "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)** "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
County   of   Loudoun
*[Type of Recording Jurisdiction]*          *[Name of Recording Jurisdiction]*

As more particularly described in exhibit "A"attached hereto and made a part hereof.

which currently has the address of **43007 JANNEYS CORNER CT.**
*[Street]*
**ASHBURN / Loudoun**   **Virginia 20148**                ("Property Address"):
*[City/County]*          *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.



G P M W D 0 0 8 7 6 0 0 9 0 4 1 1 7

obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1.   ***Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.***
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment
charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3.
Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or
other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender
unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be
made in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check,
bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose
deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such
other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may
return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.
Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any
rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not
obligated to apply such payments at the time such payments are accepted.  If each Periodic Payment is applied as of
its scheduled due date, then Lender need not pay interest on unapplied funds.  Lender may hold such unapplied
funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable
period of time, Lender shall either apply such funds or return them to Borrower.  If not applied earlier, such funds
will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.  No offset or
claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments
due under the Note and this Security Instrument or performing the covenants and agreements secured by this
Security Instrument.

2.   ***Application of Payments or Proceeds.***  Except as otherwise described in this Section 2, all payments
accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note;
(b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic
Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second
to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient
amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If
more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the
repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that
any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess
may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and
then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the
Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   ***Funds for Escrow Items.***  Borrower shall pay to Lender on the day Periodic Payments are due under
the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and
assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the
Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance
required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by
Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of
Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan,
Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower,
and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices
of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender
waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's

G P M W D 0 0 8 7 6 0 0 9 0 4 1 1 7

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.   Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby

GPMWD008760090 4117

assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.



G P M W D 0 0 8 7 6 0 0 9 0 4 1 1 7

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such

G P M W D 0 0 8 7 6 0 0 9 0 4 1 1 7

repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party," means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's

acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security

G P M W D 0 0 8 7 6 0 0 9 0 4 1 1 7

Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.**

G P M W D 0 0 8 7 6 0 0 9 0 4 1 1 7

Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.**

G P M W D 0 0 8 7 6 0 0 9 0 4 1 1 7

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          SYED KAZMI                      -Borrower

_____          _____ (Seal)
                                          Afshan Kazimi                    -Borrower

                                          _____ (Seal)
                                                                           -Borrower

                                          _____ (Seal)
                                                                           -Borrower

State of _____                §
County of _____               §
                                      §

Before me the undersigned authority, on this day personally appeared **SYED KAZMI** and **Afshan Kazimi** known to me (or proved to me through an identity card or other document) to be the person(s) whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal on this ____ day of _____ 2005

(Seal)   JOHN H. PILCHER
         Notary Public
         Commonwealth Of Virginia
         My Commission Exps. April 30, 2006

_____
Notary Public

Print Name
My Commission Expires:

---

GPMWD00876009041117

RECORDING REQUESTED BY:
JPMorgan Chase Bank, N.A.
1111 Polaris Parkway
Columbus, OH 43240

AND WHEN RECORDED MAIL TO:

BWW LAW GROUP, LLC
2020 N. 14TH STREET
SUITE 750
ARLINGTON, VA 22201

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## APPOINTMENT OF SUBSTITUTE TRUSTEE

WELLS FARGO BANK, N.A. SUCCESSOR BY MERGER TO WELLS FARGO BANK MINNESOTA, N.A., F/K/A NORWEST BANK MINNESOTA, N.A., SOLELY AS TRUSTEE FOR BEAR STEARNS ASSET BACKED SECURITIES I, LLC, GREEN POINT MORTGAGE FUNDING TRUST 2006-AR1, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR1 GRANTOR herein, is the present holder or authorized agent of the holder of the Note evidencing a debt secured by the below described Deed of Trust, or is a person entitled to enforce said Note, and does hereby remove the Original Trustee(s) as Trustee(s), and does also hereby remove any substitute trustee or trustees who may have been previously appointed in place of the Original Trustee(s), and hereby appoints EQUITY TRUSTEES, LLC., A VIRGINIA LIMITED LIABILITY COMPANY as Substitute Trustee/GRANTEE whose place of business is 2020 N. 14TH STREET SUITE 750 ARLINGTON, VA 22201. This appointment is made under the deed of trust conveying the real property known as 43007 JANNEYS CORNER CT, ASHBURN, VA 20148 and executed by SYED KAZMI AND AFSHAN KAZMI TENANTS BY ENTIRETY as GRANTOR for recordation purposes on October 11, 2005, in which MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS) AS NOMINEE FOR GREENPOINT MORTGAGE FUNDING, INC. is named original lender and SUELLEN WOHLFARTH as original trustee, and recorded October 12, 2005 in Book -----, at Page ----- or Instrument/Recording No. 20051012-0115577 in the Office of the Clerk for the Circuit Court of LOUDOUN ("Deed of Trust"). Said Substitute Trustee shall, in accordance with the provisions of said Deed of Trust, succeed to all the title, powers and duties conferred upon the Original Trustee(s) by the terms of said Deed of Trust and by applicable law.

DATED: 8-13-2012

WELLS FARGO BANK, N.A. SUCCESSOR BY MERGER TO WELLS FARGO BANK MINNESOTA, N.A., F/K/A NORWEST BANK MINNESOTA, N.A., SOLELY AS TRUSTEE FOR BEAR STEARNS ASSET BACKED SECURITIES I, LLC, GREEN POINT MORTGAGE FUNDING TRUST 2006-AR1, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR1

BY: _Vonedra Denson_        *JP Morgan Chase Bank, NA
Vonedra Denson    Vice President        as attorney in fact of

STATE OF FLORIDA
COUNTY OF DUVAL

The foregoing instrument was acknowledged before me this 10th day of Aug., 20 12 by
Vonedra Denson as Vice President of JPMorgan Chase Bank, National Association.

(SEAL)
SANELA ALAGIC
Notary Public - State of Florida
My Comm. Expires Jan 13, 2013
Commission # DD 851371

Notary Public STATE OF FLORIDA
My Commission Expires: 01-13-2013
Per personally known ___
OR Produced Identification ___ N/A
Type of Identification Produced N/A

No.: 158109487000

EXHIBIT
F

Page 1 of 1

AFTER RECORDING, PLEASE RETURN TO:
Bierman, Geesing & Ward, LLC
4520 East West Highway, Suite 200
Bethesda, MD 20814

Tax I.D.# 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-000
BGW#: 66868

**20090310-0013589**
Loudoun County, VA        Pgs: 2
03/10/2009 10:02:32AM
Gary M. Clemens , Clerk

## DEED OF APPOINTMENT OF SUBSTITUTE TRUSTEE

THIS DEED OF APPOINTMENT OF SUBSTITUTE TRUSTEE, is made this ___ day of _____ 2009, by and among WELLS FARGO BANK, NATIONAL ASSOCIATION AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., GREENPOINT MTA TRUST 2006-AR1, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR1 ("WELLS FARGO BANK"), party of the first part, and EQUITY TRUSTEES, LLC., a Virginia Limited Liability Company, of Arlington County, Virginia ("Substitute Trustees"), party of the second part.

WHEREAS, Syed Kazmi and Afshan Kazmi by Deed of Trust dated October 11, 2005, and recorded in the Office of the Clerk of the Circuit Court for Loudoun County, Virginia in Instrument No. 20051012-0115577 did grant and convey certain real estate known as:

LOT 111, SECTION 8, BLOCK A, LOUDOUN VALLEY ESTATES PHASE II, AS THE SAME APPEARS DULY DEDICATED, PLATTED AND RECORDED IN DEED BOOK 2199, PAGE 64, AMONG THE LAND RECORDS OF LOUDOUN COUNTY, VIRGINIA.

Known as: 43007 Janneys Corner Court, Ashburn, VA 20148

in trust, to secure to GreenPoint Mortgage Funding, Inc, payment of a note ("Note") of even date therewith in the original principal amount of $1,150,000.00; and

WHEREAS, said Deed of Trust provides that the holder of the Note shall have the power and authority to appoint, by an instrument duly executed, acknowledged and recorded among the Land Records aforesaid, substitute trustee(s) in the place and stead of the trustee(s) named therein; and

WHEREAS, the party of the first part is the owner and holder of the note secured by said Deed of Trust.

NOW, THEREFORE WITNESSETH, in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, the party of the first part by the execution and delivery of these presents, hereby appoint Equity Trustees, LLC, a Virginia Limited Liability Company, as Substitute Trustees under the said Deed of Trust in the place and stead of SUELLEN WOHFARTH the Trustee or Trustees originally named therein, or in place of any other trustee or trustees who have heretofore been substituted for the originally named trustee or trustees, the said substitute trustees being vested with all of the right, title and interest and clothed with all the rights, powers and privileges of the Trustee or Trustees originally named in said Deed of Trust.



EXHIBIT
E

IN WITNESS WHEREOF, WELLS FARGO BANK has caused these presents to be executed the day hereinabove first written by ___*Greg Allen*___ of EMC Mortgage Corporation as Attorney in fact for Wells Fargo Bank, National Association as Trustee for the Certificateholders of Structured Asset Mortgage Investments II Inc., GreenPoint MTA Trust 2006-AR1, Mortgage Pass-Through Certificates, Series 2006-AR1, which individual the said EMC MORTGAGE CORPORATION has been appointed as the party with proper authority so to act for the purposes contained herein.

Wells Fargo Bank, National Association as Trustee for the Certificateholders of Structured Asset Mortgage Investments II Inc., GreenPoint MTA Trust 2006-AR1, Mortgage Pass-Through Certificates, Series 2006-AR1

By: EMC Mortgage Corporation, as Attorney-in-Fact

*Greg Allen - VP*

STATE OF MINNESOTA          )
COUNTY OF DAKOTA           ) ss.

I, *Ashley Elizabeth Olson* , a Notary Public in and for the State and County aforesaid, do hereby certify that *Greg Allen* , *VP* , of EMC Mortgage Corporation, as Attorney-in-Fact of Wells Fargo Bank, National Association as Trustee for the Certificateholders of Structured Asset Mortgage Investments II Inc., GreenPoint MTA Trust 2006-AR1, Mortgage Pass-Through Certificates, Series 2006-AR1, personally appeared before me in the jurisdiction aforesaid and executed the foregoing Deed of Appointment of Substitute Trustee hereto annexed bearing the date of *February 25*, 2009, and being duly sworn, he/she stated that he/she has lawful authority to execute said instrument, and he/she acknowledged the same to be his/her willful act and deed and that of the said party of the first part.

Given under my hand and seal this *25th* day of *Feb.* , 2009.

Ashley Elizabeth Olson
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2014

Notary Public

My Commission Expires:

I hereby certify that the within instrument was prepared under the supervision of Howard N. Bierman, attorney-at-law duly admitted to practice before the Supreme Court of the Commonwealth of Virginia.

*Howard N. Bierman*

A COPY-TESTE
Gary M. Clemens, Clerk
By
Deputy Clerk

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
**20081229-0074647**
Loudoun County, VA        Pgs: 2
12/29/2008 2:26:59PM
Gary M. Clemens , Clerk

Tax I.D.# 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-000
BGW#: 66868

AFTER RECORDING, PLEASE RETURN TO:
Bierman, Geesing & Ward, LLC
4520 East West Highway, Suite 200
Bethesda, MD 20814

## DEED OF APPOINTMENT OF SUBSTITUTE TRUSTEE

THIS DEED OF APPOINTMENT OF SUBSTITUTE TRUSTEE, is made this 14th day of November 2008, by and among WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR BEAR STEARNS ASSET ("WELLS FARGO BANK"), party of the first part, and EQUITY TRUSTEES, LLC., a Virginia Limited Liability Company, of Arlington County, Virginia ("Substitute Trustees"), party of the second part.

WHEREAS, Syed Kazmi and Afshan Kazmi by Deed of Trust dated October 11, 2005, and recorded in the Office of the Clerk of the Circuit Court for Loudoun County, Virginia in Instrument No. 20051012-0115577 did grant and convey certain real estate known as:

LOT 111, SECTION 9, BLOCK A, LOUDOUN VALLEY ESTATES PHASE II, AS THE SAME APPEARS DULY DEDICATED, PLATTED AND RECORDED IN DEED BOOK 2199, PAGE 64, AMONG THE LAND RECORDS OF LOUDOUN COUNTY, VIRGINIA.

Known as: 43007 Janneys Corner Court, Ashburn, VA 20148

in trust, to secure to GreenPoint Mortgage Funding, Inc. payment of a note ("Note") of even date therewith in the original principal amount of $1,150,000.00; and

WHEREAS, said Deed of Trust provides that the holder of the Note shall have the power and authority to appoint, by an instrument duly executed, acknowledged and recorded among the Land Records aforesaid, substitute trustee(s) in the place and stead of the trustee(s) named therein; and

WHEREAS, the party of the first part is the owner and holder of the note secured by said Deed of Trust.

NOW, THEREFORE WITNESSETH, in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, the party of the first part by the execution and delivery of these presents, hereby appoint Equity Trustees, LLC, a Virginia Limited Liability Company, as Substitute Trustees under the said Deed of Trust in the place and stead of SUELLEN WOHFARTH the Trustee or Trustees originally named therein, or in place of any other trustee or trustees who have heretofore been substituted for the originally named trustee or trustees, the said substitute trustees being vested with all of the right, title and interest and clothed with all the rights, powers and privileges of the Trustee or Trustees originally named in said Deed of Trust.

**EXHIBIT**
D

BGW#: 66868

IN WITNESS WHEREOF, WELLS FARGO BANK has caused these presents to be executed the day hereinabove first written by ____Christine Anderson____ of EMC Mortgage Corporation as Attorney in fact for Wells Fargo Bank, National Association, as Trustee for Bear Stearns Asset, which individual the said EMC MORTGAGE CORPORATION has been  appointed as the party with proper authority so to act for the purposes contained herein.

Wells Fargo Bank, National Association, as Trustee
for Bear Stearns Asset

By: EMC Mortgage Corporation, as Attorney-in-Fact

_Christine Anderson—AVP_

STATE OF MINNESOTA          )
COUNTY OF DAKOTA            ) ss.

I, ____James C. Morris____, a Notary Public in and for the State and County aforesaid, do hereby certify that ____Christine Anderson____, of EMC Mortgage Corporation, as Attorney-in-Fact of Wells Fargo Bank, National Association, as Trustee for Bear Stearns Asset, personally appeared before me in the jurisdiction aforesaid and executed the foregoing Deed of Appointment of Substitute Trustee hereto annexed bearing the date of November 14, 2008, and being duly sworn, he/she stated that he/she has lawful authority to execute said instrument, and he/she acknowledged the same to be his/her willful act and deed and that of the said party of the first part.

Given under my hand and seal this __14th__ day of __November__, 2008.

JAMES C. MORRIS
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2009

My Commission Expires: Jan. 31, 2009

Notary Public

I hereby certify that the within instrument was prepared under the supervision of Howard N. Bierman, attorney-at-law duly admitted to practice before the Supreme Court of the Commonwealth of Virginia.

Howard N. Bierman

A COPY TESTE
Gary M. Clemens, Clerk
By _____
Deputy Clerk